430 F.2d 891
 John E. MOSS et al., Petitioners,
v.
CIVIL AERONAUTICS BOARD, Respondent,
American Airlines, Inc., Eastern Air Lines, Inc., Continental Air Lines, Inc., North Central Airlines, Inc., Mohawk Airlines, Inc., Braniff Airways, Inc., Northwest Airlines, Inc., Trans World Airlines, Inc., Intervenors.
 No. 23627.
 United States Court of Appeals, District of Columbia Circuit.
 Argued February 25, 1970.
 Decided July 9, 1970.
 
 Mr. Stanford G. Ross, Washington, D. C., with whom Mr. H. David Rosenbloom, Washington, D. C., was on the brief, for petitioners.
 Mr. Warren L. Sharfman, Associate General Counsel, Litigation and Research, Civil Aeronautics Board, with whom Messrs. Joseph B. Goldman, General Counsel at the time the brief was filed, and O. D. Ozment, Deputy General Counsel, Civil Aeronautics Board, and Howard E. Shapiro, Attorney, Department of Justice, were on the brief, for respondent.
 
 
 1
 Mr. Alfred V. J. Prather, Washington, D. C., for intervenors American Airlines, Inc., Eastern Air Lines, Inc., Northwest Airlines, Inc. and Trans World Airlines, Inc. Mr. J. William Doolittle, Washington, D. C., also entered an appearance for intervenor American Airlines, Inc.
 
 
 2
 Mr. Philip A. Fleming, Washington, D. C., entered an appearance for intervenor Eastern Air Lines, Inc.
 
 
 3
 Messrs. Thomas D. Finney, Jr. and Lee M. Hydeman, Washington, D. C., entered appearances for intervenor Continental Air Lines, Inc.
 
 
 4
 Messrs. Russell A. Garman, Jr. and Raymond J. Rasenberger, Washington, D. C., entered appearances for intervenors North Central Airlines, Inc. and Mohawk Airlines, Inc.
 
 
 5
 Mr. B. Howell Hill, Washington, D. C., entered an appearance for intervenor Braniff Airways, Inc.
 
 
 6
 Mr. James M. Verner, Washington, D. C., entered an appearance for intervenor Northwest Airlines, Inc.
 
 
 7
 Mr. Ulrich V. Hoffman, New York City, entered an appearance for intervenor Trans World Airlines, Inc.
 
 
 8
 Before WRIGHT, McGOWAN and ROBINSON, Circuit Judges.
 
 J. SKELLY WRIGHT, Circuit Judge:
 
 9
 This appeal presents the recurring question which has plagued public regulation of industry: whether the regulatory agency is unduly oriented toward the interests of the industry it is designed to regulate, rather than the public interest it is designed to protect. Petitioners, some 32 congressmen, alleged that the Civil Aeronautics Board, in considering the lawfulness of increases in domestic passenger fares filed by all the major air lines, excluded the public from ex parte meetings with representatives of the air line industry and then held a pro forma hearing limited to oral argument, as a result of which changes in the fare structure resulting in a six per cent rise in domestic fares were unlawfully approved. The Board admits the ex parte meetings, denies that the hearing was pro forma, and admits that, without complying with the statutory procedural requirements and criteria for rate-making by the Board, it approved in advance the filing without suspension of air line tariffs providing for a six per cent increase in air line revenues from passenger fares.[1] We hold that the procedure used by the Board is contrary to the statutory rate-making plan in that it fences the public out of the rate-making process and tends to frustrate judicial review.
 
 
 10
 * The statutory plan is relatively simple. Air line passenger rates can be made by the carrier or by the Board.[2] However made, the rates must be included in a tariff filed with the Board by the carrier.[3] It is unlawful for the carrier to charge a rate other than the existing one on file.[4] On complaint or on its own initiative, the Board may change an existing rate after public notice and hearing.[5] The Board need not indicate a specific rate; it may simply fix a maximum or minimum or both.[6] In determining and prescribing a rate the Board must take into consideration, among other factors, five statutory criteria.[7]
 
 
 11
 An air line carrier may change the existing rate by filing a new tariff with the Board indicating the new rate.[8] Under the statute, on complaint or on its own initiative the Board, by giving the carrier a statement of its reasons, may suspend the new rate for a period not to exceed 180 days while conducting an investigation as to its lawfulness.[9] After investigation and hearing, the Board may determine and prescribe the lawful rate, in accordance, of course, with the rate-making provisions of Sections 1002(d) and 1002(e) of the Federal Aviation Act.[10]
 
 II
 
 12
 Petitioners had complained to the Board on prior occasions both about the Board's practice of holding ex parte,[11] informal meetings with the carriers concerning their need for increased fares, and about the Board's lack of standards for testing the reasonableness of fares. In spite of these complaints, the informal sessions between carriers and Board members continued into the summer of 1969. In early August of 1969, following the lead of United Air Lines, the carriers filed increased passenger tariffs with the Board. While these proposed rate increases were pending before the Board, another ex parte meeting between the air line officials and members of the Board was scheduled for August 14, 1969. Petitioner Moss requested and was refused permission to attend this meeting.[12] Following the ex parte meeting on August 14, the Board issued an order calling for oral argument on the advisability of exercising its power to investigate and suspend the new rates before they went into effect. There was no suggestion in the order that the Board might promulgate its own fare formula.[13] Petitioners renewed their complaints about the Board's continued ex parte meeting and rate practices and urged the Board to suspend the tariffs, to institute a general passenger fare investigation to define more clearly the statutory rate-making standards, and finally to set reasonable rates based on these more precise standards. Petitioners, however, refused to participate in the oral argument on the ground that the Board's decision on the rate increases had already been made.
 
 
 13
 On September 12, 1969, eight days after the oral argument, the Board issued its order.[14] In that order the Board found that the proposed tariffs on file "may be unjust [or] unreasonable"[15] and ordered the tariffs suspended and investigated, as it is authorized to do by Section 1002(g) of the Federal Aviation Act.[16] Still purporting to act in accordance with its suspension authority, however, the Board went further. It found that the carriers had demonstrated a need for "some additional revenue"[17] because of greatly increased costs, and decided that a limited fare increase was necessary in order to maintain the financial vitality of the carriers as a group.[18] Accordingly, in the same order which suspended the rates proposed by the carriers, the Board outlined its own fare formula and announced its decision to "permit tariff filings implementing" that formula to be filed without suspension,[19] thus assuring almost immediate effectiveness.
 
 
 14
 The carriers promptly withdrew their previous filings and filed for new increases based on the Board's model. Petitioners, in an application for reconsideration of the September 12 order, opposed the new filings and requested their suspension and investigation. On September 30, 1969, the application was denied and the fares based upon the Board formula were allowed to stand without suspension or investigation.[20] The instant petition for review of both the September 12 and the September 30 orders followed.
 
 III
 
 15
 The question presented by this appeal is whether the Board should have followed the procedures and standards established by Sections 1002(d) and 1002 (e) of the Act before proposing the rate schedule it set forth in its September 12 order. Petitioners complain that the Board effectively "determined" rates, within the meaning of Sections 1002(d) and 1002(e), to be charged by the air carriers without proper notice and hearings as required by Section 1002(d) and without taking into account the rate-making factors enumerated in Section 1002(e).[21] The Board admits that it would have been required to act in accordance with subsections (d) and (e) if its actions amounted to the making of rates. The Board, however, contends that it was not required to adhere to the standards of subsections (d) and (e) because, as the formal title of its September 12 order ("Order of Investigation and Suspension") indicates, it was not determining rates but only exercising its power under Section 1002(g) to suspend, pending a more complete investigation, the rates initially filed by the carriers in August.
 
 
 16
 The Board also admits that immediately after its September 12 order the air lines withdrew their August tariffs and filed new tariffs listing rates based directly on and in conformity with that order. But the Board disclaims any legal responsibility for the rates listed in the carriers' September tariffs. According to the Board, the detailed outline of the rate structure which it "proposed to accept" in its September 12 order was not an attempt to prescribe or determine rates for the future within the meaning of the statute, but merely served to explain to the carriers — as required by the statute[22] — the Board's reasons for suspending the August filings. The Board points out that the carriers were not legally bound by the September 12 order of the Board to file a new tariff and list rates based on its formula. Therefore, the Board argues, even though the carriers did precisely what the Board indicated in its September 12 order should be done, the resulting rates are carrier-made rates for which the Board is not to be held accountable.
 
 
 17
 This legalistic reading of the statute is supposedly supported by the Supreme Court's decision in Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Railway Co.[23] and its progeny. We find no support in Arizona Grocery for the Board's position. For that case referred to agency-made rates as those which had been legislatively prescribed as "a maximum reasonable rate for the future" by the agency.[24] We think that these rates, like those involved in Arizona Grocery, have been determined by the Board, with the cooperation of the carriers, to be "a maximum reasonable rate for the future." The Board itself stated that it "intend[ed] to consider fares produced by [its] formula as a `just and reasonable' ceiling." Any analysis of the September 12 order can fairly lead to no other conclusion.
 
 IV
 
 18
 After finding that the rates proposed by the carriers might be unjust or unreasonable and ordering an investigation, the Board went on in the September 12 order to point out that, because of the need for revenue which the carriers had shown, the Board would "be disposed to grant an increase computed in accordance with the criteria set out below." It then set forth a rate-making formula, variously described in the order as "the formula which we are proposing," the formula "we propose to accept," and the formula which "[w]e * * * adopt * * * for our model." The formula detailed by the Board, which is set out in the margin,[25] using coach fares as its base, attempts to cope with the increased per mile costs of short flights by establishing a fixed "terminal" charge ($9.00) for all markets, with an additional charge based on the airport-to-airport mileage. According to the formula, the per mile rate decreases in each successive 500-mile block. From this formula anyone could have filled in the figures and computed the acceptable coach fares.
 
 
 19
 The Board also "concluded" that it would be appropriate for all fares to be rounded off to the nearest whole dollar. It further "propose[d] that first class jet fares be set at 125 percent of the coach fare derived by the above formula." It "would accept night coach fares computed at 75 percent of the new coach fares." The order then listed each of the various promotional fares, such as Youth Fare and Discover America, and the discounts which "the Board would permit."[26]
 
 
 20
 The Board even claimed to be acting in accordance with some of the rate-making provisions of Section 1002(e). It explained that it had granted the increases because, "[t]aking into consideration these cost pressures on the carriers, and the marked decline in earnings and profit margin since the February increase, the Board finds that a further increase in fares at this time is necessary from the standpoint of the rate-making standards of Section 1002 (e) of the Act and the need to maintain the financial vitality of the carriers as a group." Also, according to the Board, its formula "produces a reasonable increase in revenues and recognizes the economies inherent in long haul carriage * * * as well as the value of service limitations in short haul markets."
 
 
 21
 As a practical matter, the Board's order amounted to the prescription of rates because, as the Board admits, the pressures on the carriers to file rates conforming exactly with the Board's formula were great, if not actually irresistible.[27] All the carriers had indicated an urgent need for an immediate increase in revenues; the Board had made it clear, by threatening to use its power to suspend proposed rates, that only rates conforming to its detailed model would be accepted and not suspended. It explicitly stated that it would "consider fares produced by the formula as a `just and reasonable' ceiling, and any fare in excess of this ceiling would be viewed prima facie as outside the realm of justness and reasonableness and would ordinarily be suspended and ordered investigated." Any carrier wanting to file higher tariffs would be dissuaded, not only by the indications in the order that only those tariffs meeting the standards set down by the Board would be accepted, but also by the Board's explicit statement that increases would be considered only "where strong justification was shown." Furthermore, while tariffs in conformity with the Board's model would go into effect and give the carriers some additional revenue almost immediately, the Board required all filings requesting increases above those provided in the September 12 order to have a proposed effective date 75 days after filing. It would seem that upon any realistic interpretation this order involved the legislative determination of rates by an agency for the future, as described in the Arizona Grocery case.
 
 V
 
 22
 It would be blinking reality to hold, as the Board argues, that the order of September 12 did no more than suspend and initiate an investigation[28] of the rates proposed by the carriers in August. The Board did all that it could, short of formally styling its order as rate-making, to induce the carriers to adopt the proposed rates. The Board does not dispute these facts, but, in order to insulate itself from responsibility for these rates, relies upon the fact that it never in so many words "ordered" the carriers to file the rates now being charged. According to the Board, as long as the Board only "suggests" and does not order the future rates, the rates remain carrier-made. In support of this proposition the Board cites a series of cases which followed Arizona Grocery, each of which holds that certain action does not amount to agency approval of the rates in question.[29] It has been held, for example, that the agency's refusal to suspend proposed rates does not constitute agency approval of those rates. To the extent that the I.C.C. precedents are relevant to this case[30] we would agree with the Board that it takes more than a refusal to suspend proffered rates to transform them into agency-made rates.
 
 
 23
 We do not need to decide, however, in the context of this case the exact extent of agency participation which will make an agency responsible for the rates being charged by carriers. For the cases which the Board cites simply are not apposite.[31] We are not dealing with rates filed by carriers which the Board has refused to suspend, or even with allowance of small percentage increases in revenue based on existing rates,[32] but with a complete and innovative scheme for setting all passenger rates for the continental United States.[33] The Board has pointed to no case in which the Board or Commission has set out such a complete and detailed scheme for making rates which it wanted filed and in which a court has held that the resulting rates were carrier-made rates. Even a cursory reading of the order makes it clear that the Board told the carriers what rates to file; it set forth a step-by-step formula requiring major changes in rate-making practices and in rates which it expected the carriers to adopt. And the Board concededly took this action after closed sessions with carrier representatives, without statutory public hearings and, according to petitioners, without reference to the rate-making standards of the statute.
 
 
 24
 If, as the Board argues, the rates resulting from this procedure are carrier-made, rather than agency-made, the public would not only be fenced out of its role in rate-making, but judicial review of the Board's actions would be severely limited. On appeal agency-made rates are tested against the Act's explicit rate-making procedures. Thus a court must decide whether, in determining rates, the Board has properly observed the statutory procedures and taken into account the factors which Congress has said should be considered when rates are made. If the statutory plan has been complied with, the court can then determine whether substantial evidence in the record supports the Board's rates. Here the Board has in effect determined rates and the record made in so doing is inadequate for judicial review. By contrast, if the tariffs filed pursuant to the Board's order of September 12 are not Board-determined rates, judicial review is practically non-existent. Aggrieved parties can object to carrier-made rates and ask the Board to investigate them, but the Board's refusal to investigate would be reviewable only for an abuse of discretion.[34] And, of course, it would be very difficult indeed to apply this limited standard of review to a record made in large part behind closed doors.
 
 
 25
 Moreover, the Board's suspension authority, on which it relies for justification of its actions in this case, is totally insulated from judicial review.[35] It is this power which the Board uses to work its will in rate-making rather than the judicially reviewable statutory rate-making plan designed by Congress to protect the public. In the absence of a compelling justification for the Board's admitted practice of making rates by use of its suspension power, we cannot help but conclude that the Board is only seeking to avoid the strict requirements of the rate-making portion of the statute and the resulting more stringent judicial review. No requirement of Board operation or policy of the Act seems to support the Board's blatant attempt to subvert the statute's scheme.
 
 
 26
 The Board has argued that to hold it accountable for these rates would "hobble the administrative process," seemingly because it feels that the procedures required by Sections 1002(d) and 1002(e) of the Act do not permit the Board to respond quickly enough to met the immediate revenue needs of the carriers in times of rapidly rising costs.[36] While we recognize that under the statute the Board has an obligation to afford the carriers sufficient revenues,[37] that obligation cannot become a carte blanche allowing the Board to deal only with the carriers and disregard the other factors, such as the traveling public's interest in the lowest possible fares and high standards of service, which are also enumerated in the Act as rate-making criteria.[38]
 
 
 27
 Furthermore, we see no inconsistency between adhering to the statutory plan and awarding a speedy increase in carrier revenues. The statute does not require a complete, time-consuming, scholarly and theoretical review of all aspects of rate-making before the Board passes upon proposals which are submitted,[39] The Board is expected to use its experience gleaned from ongoing studies and investigations in its day-to-day activities, and it can act with reasonable speed as long as it affords public notice, holds a proper hearing, and takes the statutory factors into account when it determines rates. In any case, ignoring the general public's interests in order to better serve the carriers is not the proper response to the difficulties supposedly created by an outdated or unwieldy statutory procedure. After all, there is more to rate-making than providing carriers with sufficient revenue to meet their obligations to their creditors and to their stockholders.
 
 
 28
 In short, we simply do not agree with the Board that abdication from its proper supervisory role under the statute need be the result of today's holding requiring the Board to comply with the statute in rate-making. We would be sympathetic, for example, to instances in which the Board felt that compelling circumstances required it to act without complete information before an investigation is completed. Any approval of rates under such conditions would be subject to revision once more complete information is obtained. We would liken such emergency Board action to the interim approval which Judge Tamm recently remarked upon, in a somewhat different context. Speaking for the court, he said:[40]
 
 
 29
 "* * * [Our] assessment of the Board's findings should be bifurcated, with different standards applied to the findings relating to full and interim approval. That is, the fact that interim approval is useful primarily in situations in which the Board needs to act expeditiously * * * but lacks sufficient information to determine authoritatively whether the agreement as a whole will serve the public interest, indicates that our review of the findings supporting the interim approval should be relatively limited. Since the Board in electing to order an interim approval is essentially saying that * * * further data gleaned from practical experience is necessary to an enlightened determination of the public interest, a reviewing court can do little more than ask whether this conclusion is reasonable and based upon substantial evidence. * * *"
 
 
 30
 We fully recognize that a carrier's exigent economic circumstances at times will make it necessary for the Board to act on the basis of incomplete data. But we emphatically reject any intimation by the Board that its responsibilities to the carriers are more important than its responsibilities to the public. Board action must always comply with the procedural requirements of the statute and must always be based on an assessment of the relevant available data, with due consideration given to all the factors enumerated in the statute, which factors taken together make up the public interest.
 
 VI
 
 31
 It is true that the practice followed in this case does not fit neatly and precisely into the statutory concept of rate-making by the Board or by the carriers. Actually the practice produces rates arrived at through the cooperation of the carriers and the Board. The Board candidly admits that it devised the practice because the volatile economic conditions in the air line industry made use of the Section 1002(d) and (e) procedures impractical. But Congress requires public participation in making rates because it is the public who pays them. And under this Act, as distinguished from the Interstate Commerce and Motor Carriers Acts, there is no statutory provision for reparations to the public if the rates charged are unreasonable.[41] Hence observance of safeguards designed to protect the public before the rates are imposed is imperative.
 
 
 32
 Since the record shows, as the Board admits, that the public notice and hearing requirements of Section 1002(d) were not observed in issuing the order of September 12, that order is invalid and the tariffs filed by the carriers based thereon are unlawful. Under the circumstances, this case is remanded to the Board for further proceedings.
 
 
 33
 So ordered.
 
 
 
 Notes:
 
 
 [1]
 The scheme, as explainedinfra, involved a rate-making formula which the Board predicted would result in a total revenue increase of 6.35% for the industry as a whole.
 
 
 [2]
 Federal Aviation Act §§ 403, 1002(d), 49 U.S.C. §§ 1373, 1482(d) (1964)
 
 
 [3]
 Federal Aviation Act § 403(a), 49 U.S.C. § 1373(a) (1964)
 
 
 [4]
 Federal Aviation Act § 403(b), 49 U.S.C. § 1373(b) (1964)
 
 
 [5]
 Federal Aviation Act § 1002(d), 49 U.S. C. § 1482(d) (1964)
 
 
 [6]
 Ibid.
 
 
 [7]
 Section 1002(e) of the Act, 49 U.S.C. § 1482(e) (1964), provides:
 "Rule of rate making.
 "In exercising and performing its powers and duties with respect to the determination of rates for the carriage of persons or property, the Board shall take into consideration, among other factors —
 "(1) The effect of such rates upon the movement of traffic;
 "(2) The need in the public interest of adequate and efficient transportation of persons and property by air carriers at the lowest cost consistent with the furnishing of such service;
 "(3) Such standards respecting the character and quality of service to be rendered by air carriers as may be prescribed by or pursuant to law;
 "(4) The inherent advantages of transportation by aircraft; and
 "(5) The need of each carrier for revenue sufficient to enable such air carrier, under honest, economical, and efficient management, to provide adequate and efficient air carrier service."
 
 
 [8]
 Thirty days' notice of such a change is required. Federal Aviation Act § 403 (c), 49 U.S.C. § 1373(c) (1964)
 
 
 [9]
 Federal Aviation Act § 1002(g), 49 U. S.C. § 1482(g) (1964)
 
 
 [10]
 49 U.S.C. §§ 1482(d) and 1482(e) (1964)
 
 
 [11]
 After inquiries from petitioner Moss, the Board subsequently made transcripts of several of these meetings available
 
 
 [12]
 We observe only in passing that, if congressmen are excluded from theseex parte meetings between the Board and the air lines, ordinary rate-paying members of the public, or their representatives, would have little chance indeed to be admitted. The Board does not suggest otherwise.
 
 
 [13]
 See C.A.B. Order No. 69-8-108, Docket 21322 (August 19, 1969). The order provided that "[p]ursuant to section 1002 of the Federal Aviation Act (49 USC 1482), the Board may, upon its own initiative or in the light of complaints from interested persons, (a) suspend the effectiveness of the proposed tariffs pending investigation of the reasonableness of the proposed rates, (b) permit such tariffs to take effect while it is conducting such investigation, or (c) permit the tariffs to become effective without investigation."
 
 
 [14]
 C.A.B. Order of Investigation and Suspension, No. 69-9-68, Docket 21322 (September 12, 1969) (hereinafter cited as Order)
 
 
 [15]
 Order, at 3
 
 
 [16]
 49 U.S.C. § 1482(g) (1964)
 
 
 [17]
 Order, at 3
 
 
 [18]
 Order, at 8
 
 
 [19]
 Order, at 9
 
 
 [20]
 C.A.B. Order Denying Reconsideration, No. 69-9-150, Docket 21322 (September 30, 1969)
 
 
 [21]
 See Note 7, supra.
 
 
 [22]
 Federal Aviation Act § 1002(g), 49 U.S.C. § 1482(g) (1964)
 
 
 [23]
 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932)
 
 
 [24]
 Id. at 389, 52 S.Ct. at 186. Of course, Arizona Grocery did not focus on defining all the attributes of an agency-made rate. It is true that the rates in Arizona Grocery were the subject of a binding Commission order defining the maximum reasonable rates, but the Court nowhere stated that the existence of a binding order was crucial to the result. Instead, the Court distinguished between the adjudicative and legislative capacities of the Commission. When acting as an adjudicator, the Commission decides whether rates in the past were reasonable. "[I]ts action affected only the past * * * and adjudged for the present merely that the rate was then unreasonable." 284 U.S. at 385, 52 S.Ct. at 184. By way of contrast, when dealing with the rates which will be reasonable in the future, the Commission is exercising its legislative capacity. The Board was not acting as an adjudicator in this case. Instead, it clearly intended to legislate rates for the future, and therefore should have to adhere to the statutory provisions explicitly relating to the making of rates. See page 902, infra.
 
 
 [25]
 The Board said:
 "Turning now to the actual formula which we propose to accept, coach fares will form the core of the fare structure from which all other fares will be based. We believe that the revenue increase produced by the American formula is appropriate as discussed hereinafter, and therefore we adopt that formula for our model, to wit:
 "Fixed charge for all markets: $9.00
 plus
 A variable charge based on mileage and in accordance with the following rates per mile for the applicable portions of the total mileage:
 "Mileage Blocks Rate Per Mile
 0 - 500 6.0¢
 501 - 1000 5.6¢
 1001 - 1500 5.2¢
 1501 - 2000 5.0¢
 Over 2000 4.8¢
 "Use of this formula will have the desirable result of reducing slightly some long haul fares * * * which have for some time been considerably in excess of costs, while at the same time producing only moderate increases in short haul fares, thus minimizing the impact on the movement of traffic in these markets.
 "American has proposed that city center to city center mileage be used in computing fares. However, we are of the opinion that direct airport-to-airport mileage offers a more reasonable and rational basis for computing fares and will adopt that mileage basis for our model. We recognize that there will be instances where application of a mileage basis will be inequitable or impractical, as for example, where a carrier is required by its certificate to operate via a circuitous routing. We will permit exceptions to the rule over a particular routing where good cause is shown. Further, it is not our intent to discourage common faring of cities or of airports situated about a single city; we would expect to permit common faring under the proposed formula in much the same manner as we have heretofore, provided the mileage used bears a rational relationship to the points so common rated."
 Order, at 6-7.
 
 
 [26]
 "With respect to the various promotional fares, the Board would permit the following reduced discounts based on the coach fares derived from the above described formula:
 "Type of Fare Percent Discount[8]

Discover America 20%
Youth Standby 40
Youth Reservation 20
Family plan:
 Children 2-11 50
 Children 12-21 33 1/3

"8. With respect to the contention

of Northwest Airlines that discounts
on discounts should be eliminated, the
Board would look with favor on tariff
amendments that would eliminate
these practices (such as children's 50
percent discount on Discover America
excursion fares)."
 Order, at 8.
 
 
 [27]
 As the Board's brief states, "The compulsion [on the carriers to file rates approved by the Board] in [this] case was undoubtedly great."
 
 
 [28]
 The investigation aborted, of course, immediately on the withdrawal of all the August tariffs by all the air lines
 
 
 [29]
 See, e.g., Interstate Commerce Commission v. Mechling, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102 (1947); Interstate Commerce Commission v. Inland Waterways Corp., 319 U.S. 671, 63 S.Ct. 1296, 87 L.Ed. 1655 (1943); Algoma Coal & Coke Co. v. United States, E.D.Va., 11 F.Supp. 487 (1935).
 
 
 [30]
 While the rate-making provisions of the Federal Aviation Act and the Interstate Commerce Act are similar, the practice under them is not necessarily the same because, unlike the Interstate Commerce Act, the Federal Aviation Act has no provision for reparationsCf. T.I.M.E. Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959); Tishman & Lipp, Inc. v. Delta Air Lines, 2 Cir., 413 F.2d 1401, 1406 n. 8 (1969). Consequently, all of the cases interpreting the rate-making provisions of the Interstate Commerce Act are not necessarily relevant in determining whether the Board complied with the Federal Aviation Act in making rates. It was the reparation concern of the courts following Arizona Grocery which led them to distinguish that case by holding that a Commission order permitting a general increase in rates did not preclude a reconsideration of a particular commodity rate fixed by the carrier pursuant to the general order, so that if a particular commodity rate was found to be unreasonable reparations, as provided by the statute, could be ordered. In the absence of such a retrospective remedy for reparations for air line passengers, the procedural safeguards provided in the Federal Aviation Act become the public's sole defense against unreasonable rates permitted by the Board.
 
 
 [31]
 The Board relies heavily on Interstate Commerce Commission v. Inland Waterways Corp.,supra Note 29, in its argument. There the Commission found, in an order vacating an order suspending rates proposed by some carriers, that "the proposed schedules are shown to be just and reasonable." This, according to the Commission, did not amount to prescription of rates because it had explicitly stated that Arizona Grocery would not apply. The Supreme Court also "refrain[ed] from approving or prescribing [the rates]." 319 U.S. at 687, 63 S.Ct. 1296.
 We feel that the Board's reliance upon this case is misplaced. The Supreme Court construed the Commission's statements only as a refusal to suspend proposed rates on the grounds offered by the complainants. According to the Court, the true thrust of the Commission's action was that "the proposed schedules could not be struck down upon the erroneous view advanced by the protestants." Id. at 686, 63 S.Ct. at 1305. Furthermore, the rates in question were filed by the carriers of their own volition, and were not rates outlined by the agency. See also Note 30, supra.
 
 
 [32]
 See Emergency Freight Charges, 1935, 208 ICC 4 (1935). Two court cases cited by the Board grew out of these Commission proceedings. They were Birmingham Slag Co. v. United States, N.D.Ala., 11 F. Supp. 486 (1935), and Algoma Coal & Coke Co. v. United States, supra Note 29.
 The Board, in arguing these cases, omits one very crucial fact. In these cases, involving a general rate order of the Commission which permitted an overall maximum percentage rate increase, the question presented to the court was whether individual shippers could challenge, in court, the validity of individual rates filed by carriers pursuant to the general rate order before asking the Commission to determine the reasonableness of the individual rates pursuant to §§ 13 and 15 of the Interstate Commerce Act, 49 U.S.C. §§ 13 and 15 (1964).
 The cited cases do not involve an attempt to avoid judicial review of agency action or the fixing of rates without complying with the procedural requirements of the statute. In recent cases of the same genre as Birmingham and Algoma, such as Alabama Power Co. v. United States, infra, the Commission has explicitly stated that judicial review of its general rate order is available. See 49 U.S.C. § 15(a) (1964). The Commission admits that its finding in these proceedings, to the effect that a "general rate increase is warranted," see 49 U.S.C. § 15a (1964), must be supported by substantial evidence, and that a claim to the contrary "states a claim warranting direct judicial review." Memorandum for the United States, the Interstate Commerce Commission and the Secretary of Agriculture, Alabama Power Co. v. United States, probable jurisdiction noted, 398 U.S. 903, 90 S.Ct. 1687, 26 L.Ed.2d 60 (1970). See also Alabama Power Co. v. United States, D.D.C., Civil Action No. 2970-68, December 4, 1969 (Wright, J., dissenting).
 In the 1935 rate proceedings discussed above, before allowing certain percentage increases in rates "[a]s a temporary measure, for the immediate alleviation of the more acute financial distress of the railroads," Emergency Freight Charges, 1935, supra, 208 ICC at 48, the Commission conducted nearly three months of public hearings at sites scattered throughout the country so the general public could easily attend and offer comments, see id. at 9, and invited written comments and briefs from all interested parties. In like manner the Commission held extensive hearings, before four examiners concurrently, from September 9 to October 8, 1968, in the proceedings which were challenged in the Alabama Power case.
 Thus the Commission, unlike the Board, seems to recognize its responsibility to follow the procedural requirements of the statute and to allow its action permitting the general rate increase to be tested against the statute. The Commission only asks that court review of particularized, individual rates be withheld under these circumstances until the Commission itself has had an opportunity to judge the reasonableness of the particular rate in question and award reparations if warranted.
 
 
 [33]
 In addition to the cases cited above, the Board also relies on Public Utilities Commission of California v. United States, 9 Cir., 356 F.2d 236, cert. denied, 385 U.S. 816, 87 S.Ct. 35, 17 L.Ed.2d 54 (1966). That case involved a "Public Notice" issued by the Federal Communications Commission, after a series of informal meetings between the Commission and the Bell System. In that notice the Commission informed the public that Bell was planning to file lowered tariffs for long distance telephone service. Petitioners asked the Commission to reconsider this public notice, contending that by issuing an announcement about future rate filings the Commission had made rates within the meaning of 47 U.S.C. § 205 (1964). Reconsideration was denied by the Commission because its action "was [not] a ruling on the proposed tariff filing," and the Commission's action was affirmed on appeal to the Ninth Circuit
 While we have no occasion to pass upon the wisdom of that decision, which involves a somewhat different statute and a different industry, we note that the case is distinguishable from the one at bar. There is no indication in the court's opinion that the Commission determined the new rates by use of its suspension power, see 47 U.S.C. § 204 (1964), as was done in this case. Nor is there any indication that the Commission advised the Bell System about the rate filings which would be acceptable to the Commission and which would, in the Commission's opinion, constitute a "`just and reasonable' ceiling," as the Board advised the carriers in the instant case.
 
 
 [34]
 Trailways of New England, Inc. v. C.A.B., 1 Cir., 412 F.2d 926 (1969); Flight Engineers' International Ass'n, EAL Chapter v. C.A.B., 118 U.S.App. D.C. 112, 332 F.2d 312 (1964); Pan American-Grace Airways v. C.A.B., 85 U.S.App.D.C. 297, 178 F.2d 34 (1949)
 
 
 [35]
 See Arrow Transportation Co. v. Southern Railway Co., 372 U.S. 658, 667, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963).
 
 
 [36]
 At oral argument there was repeated reference to the incredible length of time (four and a half years) consumed by a recent general passenger fare rate investigation. Because the Board seems unable to complete such full investigations until years after successive rate increases have become necessary, the Board's reliance upon the new general rate investigation it has ordered as the proper solution to the problems raised by petitioners seems misplaced
 
 
 [37]
 49 U.S.C. §§ 1302, 1482(e) (5) (1964)
 
 
 [38]
 See 49 U.S.C. § 1482(e) (2)-(3) (1964).
 
 
 [39]
 As petitioners' brief points out:
 "Moreover, * * * the Board appears to be confusing a general passenger fare investigation * * * with the hearing that Petitioners urge is always necessary under section 1002(d) whenever the Board undertakes to prescribe or approve rates. There is no reason whatsoever why the 1002(d) hearing should require 4½ years, and, as the Board has not conducted such hearings, no horrible example to cite."
 Petitioners' Brief at 34 n. 27. (Emphasis in original.)
 
 
 [40]
 National Air Carrier Ass'n v. C.A.B., U.S.App.D.C., (No. 23,012, decided May 28, 1970) (slip opinion at 19). The Supreme Court has also recognized that economic pressures on the carriers may make it necessary for an agency to base its action "upon evidence which the Commission assumed was typical in character, and ample in quantity, to justify the finding made in respect to each division of each rate of every carrier." New England Divisions Case, 261 U.S. 184, 196-197, 43 S.Ct. 270, 275, 67 L.Ed. 605 (1923). Mr. Justice Brandeis, for the Court, explained why Congress could not have required the Commission to take specific evidence about each carrier affected by its order:
 "Obviously, Congress intended that a method should be pursued by which the task, which it imposed upon the Commission, could be performed. The number of carriers which might be affected by an order of the Commission, if the power granted were to be exercised fully, might far exceed six hundred; the number of rates involved, many millions. The weak roads were many. The need to be met was urgent. To require specific evidence, and separate adjudication, in respect to each division of each rate of each carrier, would be tantamount to denying the possibility of granting relief. * * *
 "* * * It was the actual necessities of procedure and administration which had led to the adoption of that method, in passing upon the reasonableness of proposed rate increases, * * *"
 261 U.S. at 197-198, 43 S.Ct. at 275. See also United States v. Louisiana, 290 U.S. 70, 76-77, 54 S.Ct. 28, 32, 78 L.Ed. 181 (1933):
 "The natural construction of the section, one consistent with its language, and making possible its practical operation, is that which has uniformly been given to it by the Commission. Section 15a (2) does not relieve the Commission from the responsibility of seeing to it that the rates as increased are to be reasonable. But in performing the duty broadly to increase carrier revenue, it is enough if the Commission, in the first instance, makes such inquiry and investigation as would enable it to say that the prescribed increases when applied to members of the group will generally not exceed a reasonable maximum. The extent of this inquiry and the detail of investigation can not be marked by this Court with certainty. The size of the group dealt with, the nature of the traffic, the urgency of the relief demanded, these and other factors should condition the Commission's procedure in each case. * * * The requirement that increase of rates by Commission action is to be in the exercise of its power to prescribe reasonable rates is thus observed but in conformity to the administrative necessities which the proviso contemplates."
 
 
 [41]
 See Note 30, supra.