Ralph NADER and Reuben B. Robertson, III, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION, and the United States of America, Respondents,

American Telephone and Telegraph Company, United States Independent Telephone Association, Air Transport Association of America, Telephone Users Association, Inc., and Commonwealth of Pennsylvania, Intervenors.

MICROWAVE COMMUNICATIONS, INC. and MCI Telecommunications Corporation, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION, and the United States of America, Respondents,

American Telephone and Telegraph Company, Air Transport Association of America, et al., Commonwealth of Pennsylvania, and the American Broadcasting Companies, Inc., et al., Intervenors.

Nos. 73–1045, 73–2051.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 10, 1974.

Decided Sept. 29, 1975.

William J. Byrnes, Washington, D. C., with whom Michael H. Bader, Washington, D. C., was on the brief for petitioners in No. 73–2051.

Alan B. Morrison, Washington, D. C., with whom Paul G. Evans and Reuben B. Robertson, III, Washington, D. C., were on the brief for petitioners in No. 73–1045.

Philip V. Permut, Counsel, Federal Communications Commission with whom Daniel R. Ohlbaum, Acting Gen. Counsel and Joseph A. Marino, Associate Gen. Counsel, Federal Communications Commission, were on the brief for respondent. John W. Pettit, Gen. Counsel, Federal Communications Commission, at the time the record was filed and Ashton R. Hardy, Gen. Counsel, Federal Communications Commission, also entered appearances for respondent Federal Communications Commission.

Howard J. Trienens, Chicago, Ill., of the bar of the Supreme Court of Illinois pro hac vice by special leave of court, with whom Richard J. Flynn, Chicago, Ill., John E. Haley, Washington, D. C., Jules M. Perlberg, Chicago, Ill., and John F. Preston, Jr., New York City, were on the brief for intervenor American Telephone and Telegraph Co. Jules M. Perlberg, Chicago, Ill., entered an appearance for intervenor American Telephone and Telegraph Co.

Carl D. Lawson, Atty., Dept. of Justice, was on the brief for respondent, United States of America.

Thomas J. O'Reilly, Washington, D. C., was on the brief for intervenor, United States Independent Telephone Assn.

James E. Landry, William E. Miller, Herbert E. Forrest, Charles R. Cutler, Washington, D. C., were on the brief for intervenors Air Transport Association of America and Aeronautical Radio, Inc.

Arthur S. Curtis, Washington, D. C., was on the brief for intervenor Telephone Users Ass'n, Inc.

Gordon P. MacDougall, Sp. Asst. Atty. Gen., was on the brief for intervenor Commonwealth of Pennsylvania.

Joseph M. Kittner, Norman P. Leventhal, Washington, D. C., Joseph DeFranco, New York City, and Howard Monderer, Washington, D. C., were on the brief for intervenors, American Broadcasting Companies, Inc., CBS, Inc. and National Broadcasting Co., Inc.

Howard E. Shapiro, Atty., Dept. of Justice, entered an appearance for respondent, United States of America.

Before FAHY, Senior Circuit Judge, and TAMM and ROBINSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge TAMM.

Dissenting opinion filed by Senior Circuit Judge FAHY.

TAMM, Circuit Judge:

Petitioners seek review of four orders of the Federal Communications Commission arising from its investigation of American Telephone & Telegraph Co.'s (AT&T or Bell) 1971 rate increases. In the first order issued November 22, 1972,

the Commission rejected AT&T's 1970 tariff filing intended to raise its rate of return to 9.5% and determined that a fair rate of return on AT&T's interstate investment would be 8.5%. 38 F.C.C.2d 213 (1972).[1] The second order supplemented the first by disposing of individual exceptions filed by the parties. 38 F.C.C.2d 492 (1972). The third implemented the November 22, 1972 order by accepting AT&T's rate increases designed to achieve the 8.5% return. 38 F.C.C.2d 984 (1973). The final order denied applications for rehearing of the first three. 42 F.C.C.2d 293 (1973).

Petitioners in 73–1045, Ralph Nader and Reuben Robertson, as telephone users and rate payers, challenge the validity of the Commission's November 22, 1972 order, arguing that the Commission erred by granting AT&T a rate of return as high as 8.5% and by refusing to adjust that figure to account for the earnings of AT&T's manufacturing subsidiary, Western Electric. Petitioners in 73–2051, Microwave Communications, Inc. and its affiliate, MCI Telecommunications Corp., (hereinafter petitioner or MCI) provide specialized communication service in competition with AT&T. MCI claims that the Commission abused its discretion and violated several sections of the Communications Act of 1934 by the manner in which it allowed AT&T to implement the November 22, 1972 decision. AT&T, who has a vital interest in the outcome of this case, has intervened in support of the Commission. Other intervenors have also presented a number of arguments.

After careful consideration of the arguments, we affirm the Commission. However, in the course of our deliberations, we became concerned that the parties' true complaint is the Commission's inability to resolve within a reasonable time the issues arising from its regulation of AT&T. At least two crucial issues are now entering their tenth year

of consideration without a decision from the Commission. Pursuant to our obligation to scrutinize such delays, see 5 U.S.C. § 706(1) (1970), we find that the Commission has unreasonable delayed decision of issues vital to the parties, and provide herein directions to accomplish the orderly and expeditious resolution of these issues.

## I. Background

American Telephone & Telegraph Company, the world's largest utility, derives its interstate revenue from several classes of communication service; 80% is from message toll telephone service (MTS), in which the user dials his call or is assisted by an operator and pays for the service on a per-call basis. A variant of MTS, Wide Area Telephone Service. (WATS), which allows the customer to make direct dialed telephone calls anywhere within a specified service area at monthly rates, accounts for approximately 7% of AT&T's interstate revenue. MTS and WATS are essentially monopoly services in which AT&T does not face competition.

The other 13% of AT&T's interstate revenue accrues from private line service, which can consist of telephone, telegraph, audio and video program transmission and data transmission services. These services provide the customer with continuous communication between fixed points without the necessity of establishing a new circuit for each message. Unlike MTS and WATS, several specialized carriers, including MCI, compete against AT&T in this part of the market.

In November 1970, AT&T filed tariffs designed to produce an additional $545 million in earnings before taxes and to increase AT&T's interstate rate of return to 9.5%.[2] The filing increased rates on its monopoly MTS and WATS services, but not on its competitive private line services. On January 12, 1971, the Commission requested AT&T to postpone

1. All cases cited from the Federal Communications Commission Reports are captioned *American Telephone & Telegraph Co.*

2. AT&T estimated that the rate increases would yield $385 million and result in cost savings of $160 million. 27 F.C.C.2d 149, 152 (1971).

the effective date of its proposed $545 million increase, and granted permission to file tariffs increasing net earnings before taxes to $250 million. AT&T agreed and substituted a tariff which increased MTS rates by $175 million and reduced costs by $75 million. Tariffs for private line services again remained unaffected.

On January 21, 1971, the day before AT&T's revised tariff was to become effective, the Commission suspended its effectiveness for five days, made it subject to an accounting and refund order,[3] and instituted Docket 19129 to investigate the lawfulness of AT&T's original and revised rate increases. 27 F.C.C.2d 149 (1971). The first phase of Docket 19129 would consist of an investigation into the appropriate overall rate of return for interstate and foreign investment. *Id.* at 156–57. The investigation would then continue in a second phase to consider, *inter alia,* the relationship between AT&T's interstate earnings on communication services and earnings from its manufacturing subsidiary, Western Electric. The Commission also noted that AT&T's new tariffs:

> rest on an implicit conclusion that the additional revenue requirements claimed by AT&T . . . should be met by imposing higher charges on [MTS] users, to the exclusion of increases or adjustments in the rates of other classes of service provided by [it]. The basis for this assumption is not shown and we expect AT&T to carry the burden of proof on this issue in Docket No. 18128, in which we also expect AT&T to demonstrate that the

instant rate increases do not involve any cross-subsidization of other services provided by the carriers involved. *Id.* at 155–56.

The significance of this statement requires some explanation. The private line carriers who compete with AT&T claim that they are victims of its practice of cross-subsidization. Specifically, they assert that AT&T is able to charge unrealistically low rates where competition is present and yet still earn an adequate rate of return by increasing the charges for monopoly services, thus driving its competitors out of business.

These allegations of cross-subsidization are not wholly unfounded. In 1965, the Commission initiated an investigation into AT&T's rate structure after AT&T furnished a report, known as the seven-way cost study, which showed wide variations in the earnings among the various classes of AT&T's services. The study indicated that: "At one extreme, message toll telephone and WATS were earning at the rates of 10 and 10.2 percent respectively, while Telpak, [a private line service] at the other extreme, was earning at the rate of 0.3 percent. . . ." 2 F.C.C.2d 871 (1965). This investigation, Docket 16258, was initially divided into two phases. Phase I, was to investigate AT&T's total revenue requirements on interstate service and develop ratemaking principles in order to distribute properly the revenue to each class of service. 2 F.C.C.2d 142–43 (1965). Phase II was to examine, *inter alia,* the reasonableness of Western Electric's prices and the amounts properly includable in AT&T's investment or rate base. 9 F.C.C.2d 30, 35 (1967).

---

**3.** 47 U.S.C. § 204 (1970) provides that when a rate increase becomes effective while the Commission is still investigating its lawfulness:

> the Commission may by order require the interested carrier . . . to keep accurate account of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier . . . to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased

charges as by its decision shall be found not justified.

In the case *sub judice,* the Commission approved AT&T's accounting procedure which would account for the increases on an individual basis except for paid coin-box and hotel guest calls. 27 F.C.C.2d at 157–58. Since the cost of maintaining individual records for the latter classes was estimated to be five times greater than the additional revenue that would be collected, the Commission approved a procedure to account for these classes as a whole. *Id.* at 158.

In December 1966, the Commission found that the rate of return portion of Phase I was advancing more rapidly than the development of ratemaking principles. Therefore, Phase I was separated into two proceedings: Phase IA, to investigate the rate of return,[4] and Phase IB to determine ratemaking principles and rate relationships among the various classes of interstate services. 5 F.C.C.2d 844 (1966). In July 1967, the Commission decided the Phase IA questions, holding, *inter alia,* that AT&T's fair rate of return was in the range of 7–7.5%. 9 F.C.C.2d at 51–88. However, Phase IB never reached the decisional stage. Instead, the record was transferred to Docket 18128, which had been instituted to investigate the lawfulness of rate increases to AT&T's private line Telpak service. 18 F.C.C.2d 761 (1969). By this means, the Commission hoped to test the ratemaking principles developed in Phase IB against actual tariff increases. *Id.* at 764. Similarly, no decision was reached in Phase II of Docket 16258 which was later abandoned. 32 F.C.C.2d 701 (1971).

Thus, to recapitulate, when the Commission commenced its Docket 19129 investigation into AT&T's November 1970 proposed increases, it set forth the following procedures: Phase I would determine whether AT&T was entitled to a rate of return higher than the 7–7.5% found reasonable in 1967; Phase II would determine how Western Electric's earnings would affect the Commission's revenue decision; and Docket 18128, composed in part of Phase IB of Docket 16258, would adjudicate the question of rate relationships among the various classes of interstate services and the cross-subsidization issue. Further, when the Commission instituted Docket 19129, it expected that the rate relationship and cross-subsidization issues in Docket 18128 would be decided by the end of the Phase I rate of return proceeding. 27

F.C.C.2d at 161. Thus, the Commission apparently contemplated, when it stated that rate adjustments may be made at the end of Phase I, that it would be able to determine whether any rate increases should be borne solely by MTS users to the exclusion of users of private line services. *See id.* at 157, 161.

Unfortunately, by April 1971, the Commission's trial staff concluded that Phase I of Docket 19129 would be concluded well in advance of Docket 18128. The staff therefore petitioned the Commission to clarify its January 21, 1971 order as to "whether the [MTS] users, assuming that AT&T can demonstrate the need for additional revenue requirements, should bear the entire burden of any such increases even on an interim basis." 30 F.C.C.2d 503–04 (1971). In addition, the staff proposed that during Phase I, AT&T should justify why additional revenues should be raised solely through increases in MTS rates, and that in the absence of such justification, the increases should be apportioned across all classes of services. *Id.* at 504. In response, AT&T argued that whether its rate increases should be apportioned was the very issue to be decided in Docket 18128, and that any increases it proposed would be " 'consistent with sound ratemaking principles on an interim basis.' " *Id.* In light of AT&T's position, the Commission rejected the staff's proposal. *Id.*

Thereafter, Phase I hearings were concluded and the Administrative Law Judge released his Initial Decision on August 30, 1971. The ALJ concluded that Bell's fair and reasonable rate of return would be 8.25% and that earnings in the range of 7.9–8.8% should not provoke another hearing. 41 F.C.C.2d 389, 441–42 (1971). Moreover, the ALJ rejected the contention of the Commission's trial staff, in its findings of fact, that a Phase I adjustment should be

---

4. The Commission also decided to consider the jurisdictional separation issue in Phase IA. Briefly, this issue involved the propriety of AT&T's accounting methods for allocating investment, expenses, taxes and depreciation between its interstate and intrastate operations. *See* 5 F.C.C.2d 844–46 (1966).

made to account for Western Electric's earnings. *Id.* at 447.

On November 22, 1972, the Commission issued its final decision on Phase I, holding that AT&T's overall minimum fair rate of return should be 8.5%. 38 F.C.C.2d at 245. The Commission reviewed AT&T's 1971 operating results and concluded that the utility required an additional $145 million in interim relief to achieve the 8.5% return. *Id.* at 249–51.[5] Based on these results, the Commission struck as unlawful AT&T's original tariff filing designed to raise $545 million and authorized it to submit new tariffs that would provide an additional $145 million. *Id.* at 251. The Commission cautioned that this interim rate increase should be subject to the same accounting and refund order as the original $250 million interim adjustment, and that it expected the increase to be "consistent with sound ratemaking principles. . . ." *Id.* at 246, 251.

In its November 22, 1972 order, the Commission also responded to the contention that either AT&T should not be allowed interim relief until the cross-subsidization issue was decided in Docket 18128 or that any interim rate increase should be apportioned across all classes of services. The Commission again rejected these arguments, observing that they had already been fully considered, that the increases were subject to an accounting and refund order, and that: "In view of the demonstrated need of Bell for increased earnings to attract capital on reasonable terms and to maintain its credit, we see no sound reason to defer any increased rates until after we decide Docket 18128." *Id.* at 246.

In response to the Commission's November 22, 1972 decision, AT&T filed new interim tariffs for Commission review, again placing the entire rate increase on MTS and WATS users. In its January 12, 1973 decision reviewing this increase, the Commission stated that:

The essential and single issue . . . is whether AT&T has made a sufficient showing that its proposed rate schedules have been reasonably designed to afford it the revenue relief in the amount we determined in Phase I of this proceeding to be required. If this issue is resolved in the affirmative, then, in accordance with the procedures we have heretofore established . . . such proposed rates may be allowed to become effective on an interim basis subject to further hearings as to the lawfulness of the specific components of the revised rate schedules, and subject, further, to our decision in Docket No. 18128.

38 F.C.C.2d at 985. Concluding that AT&T's revisions appeared reasonably designed to raise $145 million in revenues, *id.* at 987, the Commission again refused to reject the tariff for AT&T's failure to allocate any of the increase to private line service because:

whether AT&T can properly support its choice of the particular rate elements increase or can support its decision not to increase the private line service rates are matters to be resolved in Phase II herein and in Docket 18128. We hold only that AT&T has given sufficient reasons in support of the proposed rate schedule to warrant our allowing it to be filed as an interim rate schedule subject to accounting, refunds and further hearings as to the lawfulness thereof.

*Id.* at 987.

On the same day that the Commission released its opinion accepting AT&T's new interim tariffs, January 12, 1973, petitioners Nader and Robertson filed their petition for review of the Commission's November 22, 1972, Phase I decision. Because several petitions for reconsideration were pending before the Commission, this court, on April 16, 1973, stayed the appeal until the Commission ruled. On August 10, 1973, the Commis-

---

**5.** While the Commission authorized AT&T to file tariffs designed to achieve a return of 8.5%, the Commission established a range above this level—8.5–9%—which would not prompt a regulatory response. The Commission's goal was to thereby encourage AT&T to improve its efficiency and productivity. 38 F.C.C.2d 213, 245–46 (1972).

sion reaffirmed its prior orders in all respects. 42 F.C.C.2d 293 (1973). MCI's petition for review in this court followed, and on November 1, 1973, we consolidated its appeal with that of Nader and Robertson.

In view of the proliferation of dates, dockets, and parties, we have summarized the proceedings as follows:

Docket 19129—Proceeding from which these appeals emanate. Instituted to investigate lawfulness of AT&T's November 20, 1970 tariff filing. 27 F.C.C.2d 149 (1971).

Phase I—Adjudicated rate of return issue. Decided November 22, 1972. 38 F.C.C.2d 213 (1972). Implemented January 12, 1973. 38 F.C.C.2d 984 (1973).

Phase II—Was considering issues of AT&T's expenses and investment, and reasonableness of Western Electric's earnings. See 27 F.C.C.2d 149 (1971).

Docket 16258—First comprehensive investigation into the lawfulness of AT&T's rates. Instituted December, 1965. 2 F.C.C.2d 142 (1965).

Phase I—Initiated to determine AT&T's total revenue requirements and ratemaking principles for distributing these requirements to each class of interstate service.

Phase IA—Determined total revenue requirements, i. e., rate of return. 9 F.C.C.2d 30 (1967).

Phase IB—Was to consider applicable rate-making principles including cross-subsidization issue. Terminated in 1969, and record incorporated into Docket 18128.

Phase II—Was to investigate adjustments to be made to AT&T's rate base and expenses, and what adjustments were necessary to account for Western Electric's earnings. Phase II of Docket 16258 was terminated along with Phase II of Docket 19129 on December 23, 1971. 32 F.C.C.2d 701 (1971). Apparently because the issues were similar, Phase II of Docket 16258 was not renewed.

Docket 18128—Consolidated with Phase IB of Docket 16258 in 1969, 18 F.C.C.2d 761 (1969). Currently considering rate relationships among various classes of services includes cross-subsidization issue.

## II. The Issues in No. 73–1045

■ Under the principle that a utility is entitled to rates that allow it, under honest, economical, and efficient management, to achieve a fair overall return, e. g., *Bluefield Water Works & Improvement Co. v. Public Service Commission,* 262 U.S. 679, 692–95, 43 S.Ct. 675, 67 L.Ed. 1176 (1923), the Commission set out in Phase I of Docket 19129 to determine what AT&T's rate of return on its interstate investment should be. Essentially, AT&T's rate of return is a composite of the return on the two components of AT&T's investment—debt and stockholder's equity. The Commission found that AT&T's cost of debt was 6.0% and that the cost of raising equity capital (the fair return on equity) was 10.5%. Finding that AT&T's capital structure consisted of 45% debt and 55% equity, the Commission arrived at an overall 8.5% rate of return through the following simple formula:

| Item | Proportion of Capital (percent) | Cost Rate (percent) | Proportion of Total Cost (percent) |
|---|---|---|---|
| Debt | 45 | 6.0 | 2.70 |
| Total Equity | 55 | 10.5 | 5.78 |
| Total Cost (including convertible preferred) | | | 8.48 |
| Use | | | 8.5 |

Petitioners in 73–1045, Ralph Nader and Reuben Robertson, do not object to the Commission's cost of debt finding, nor to the allocation of capital between debt and equity. Their first complaint is that "[t]he Commission erroneously allowed AT&T a return of 10.5% on its equity." Petitioners' Br. at 17. Their second is that the Commission erred by failing to adjust AT&T's overall rate of return to account for Western Electric's earnings. Each claim of error implicitly raises the question of the appropriate standard of judicial review, and we examine them *seriatim.*

#### A.

Since the Phase I rate of return investigation is an integral part of the investigation of AT&T's rates and charges, the Commission's responsibility is to determine what rate of return is "just and reasonable." 47 U.S.C. §§ 204, 205 (1970). In making this determination, there is a "zone of reasonableness" within which the Commission's determination must be upheld. *Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), *citing FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 585, 62 S.Ct. 736, 86 L.Ed. 1037 (1942). Consequently, a party who seeks to set aside such an order "carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944). Our function is not to impose our own standards of reasonableness upon the Commission, but rather to ensure that the Commission's order is supported by substantial record evidence and is neither arbitrary, capricious, nor an abuse of discretion. *See* 5 U.S.C. § 706(A), (E) (1970); *Goodman v. Public Service Commission,* 162 U.S.App.D.C. 74, 497 F.2d 661 (1974).

The thrust of petitioners' argument is actually that the Commission's award of a 10.5% return on AT&T's equity was arbitrary and capricious. That standard has recently been interpreted by the Supreme Court in *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974):

> Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . ." *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416 [91 S.Ct. 814, at 824]. The agency must articulate a "rational connection between the facts found and the choice made."

*Burlington Truck Lines v. United States,* 371 U.S. 156, 168 [83 S.Ct. 239, 246, 9 L.Ed.2d 207] (1962). While we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.,* 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595 [65 S.Ct. 829, 836, 89 L.Ed. 1206] (1945).

*Id.* at 285–86, 95 S.Ct. at 442.

Applying that standard here, we find that while the Commission explained in depth its reasons for not accepting AT&T's presentation, it was not as fastidious in explaining why a 10.5% rate of return was, in fact, justified. Paragraph 84, where the Commission announces its holding, states:

> There are many techniques for producing useful factual information as a basis for determining the equity return which should be allowed in the computation of the overall fair rate of return. We have discussed in the preceding paragraphs the evidence of record in this proceeding regarding most of the specific measurements that are normally used in attempting to quantify the return required for equity capital and have stated our views with regard thereto. However, in the final analysis, large areas of judgment must be applied to each of the measurements used. Therefore, while not attempting to make specific findings with regard to each measurement, we find that it is reasonable to conclude that, on the basis of the evidence in this record and the subsequent factual information of which we have taken official notice, 10.5% is the minimum return on equity required by Bell.

38 F.C.C.2d at 238.

Were we left with this bare bones conclusion, we would be constrained to reverse; the Commission cannot satisfy the requirement of reasoned decision making inherent in the arbitrary

and capricious standard of review by claims of judgment and expertise and assurances that the record has been examined. In terms of ratemaking, the agency's expertise allows us to accept its judgment after it defines the zone of reasonableness; but we cannot rely on claims of judgment to explain how the agency arrived at the zone. Nevertheless, we are mindful that we must uphold the Commission's decision if, upon consideration of the entire record, the agency's rationale reasonably may be perceived. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., supra,* 419 U.S. at 285–86, 95 S.Ct. 438; *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945); *WAIT Radio v. FCC,* 135 U.S.App.D.C. 317, 418 F.2d 1153, 1156–57 (1969); *cf. Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade,* 412 U.S. 800, 806–07, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) (Opinion of Marshall, J.). We believe that a careful examination of the entire Commission opinion elicits the necessary rationale.

Petitioners claim that the Commission "offered no reasons for picking the 10.5%, other than the fact that Dr. Myers [an expert who testified on behalf of the Commission's trial staff] used it . . . ." Petitioners' Br. at 24. They find fault with the Commission's utilization of Dr. Myers' conclusion because they maintain that the Commission relied on a single method of analysis, which supports a rate of return no higher than 10%, while Dr. Myers utilized three analytical methods conjunctively.[6]

Even if we were to accept petitioners' characterization of the decision as rejecting all of the evidence offered except one method of analysis, we think that the Commission's decision is not arbitrary and capricious. Dr. Myers testified that based on his study of the performance of New York Stock Exchange

stocks, investors expected a return of 10–12% from an average security. J.A. Vol. II, at 444–45. His study of AT&T's recent performance led him to opine that AT&T tended to be less risky than average, having a lower market sensitivity than the typical security. Based upon this risk assessment, Dr. Myers testified that the rate of return should be set "in the lower part" of the 10–12% range.

The Commission explicitly mentioned this study in paragraph 82 of its opinion and petitioners concede that the Commission accepted this evidence. However, they contend that the testimony supports a finding no greater than 10%, since, in their view, "the figure of 10.5% obviously does not correspond to the 'lower part' . . . of the 10–12% range described by Dr. Myers . . . but is in fact 25% of the way from the bottom." Petitioners' Br. at 21. We reject this argument as specious. Unless the English language has lost all meaning, the twenty-fifth percentile on a scale from one to one hundred can be considered the lower part of the range. More fundamentally, however, there is no reason to quibble over whether the twenty-fifth percentile is the top portion of the lower range or the low portion of the middle because the Commission's decision is measured against a "zone of reasonableness." *FPC v. Hope Natural Gas Co., supra.* Certainly, 10.5% falls within this zone even if petitioners' construction of the Commission's decision is accepted.

Moreover, we cannot accept petitioners' contention that the Commission relied only on the past rate-of-return testimony of Dr. Myers. Throughout its opinion, there are a number of explanations that support the Commission's result. In paragraph 55, the Commission states that "in Bell's case, the importance of the higher costs of new debt is in its impact upon Bell's current and im-

---

**6.** Actually, it appears that Dr. Myers used five different methods for calculating the cost of AT&T's equity capital. J.A. Vol. II at 455–56. His conclusion was that "[n]o single item . . . is in itself sufficient to determine AT&T's cost of equity capital. Taken together, however, they clearly indicate that estimates of 10 to 11 percent are reasonable." *Id.* at 456.

mediate future costs of equity," and in paragraph 60, recognizes that the current cost of debt to Bell has risen from 5.5–6% in 1967 to 7.25–7.5% in 1971. The Commission had observed earlier, in paragraphs 48–49, that in 1967 Bell was allowed to earn 9–9.5% on its equity. Thus, while the Commission states in paragraph 60 that the increased current debt costs do not justify an increase in the return on AT&T's equity from 9.3% in 1968 to 12.5%, it is reasonably inferable that the increased debt cost of 1.25–2% suggests an increased return on equity from 9.3% in 1968 to 10.5%.

Similarly in paragraph 64, the Commission states that it is "desirable to arrest the decline in Bell's interest coverage,"[7] which had fallen from 6.3 in 1966 to 2.9 by the end of 1970. During the time of the decline, AT&T earned a return on equity of 9–9.5%. Thus, a rate of return in excess of 9–9.5% might reasonably be required to stabilize interest coverage. We cannot say based solely on this rationale that 10.5% would be outside the "zone of reasonableness."

In paragraphs 66–67, the Commission considered Bell's contention that in Docket 16258, the Commission stated it "would give particular attention to the earnings of electric utilities." AT&T argued that electric utilities were earning 12.5% on equity and that Bell was at least as risky as electric utilities. In paragraph 67, the Commission states that Bell is not as risky as the electric utilities because its capital structure is not as heavily laden with debt. However, the Commission noted that: "We are not holding that Bell should not have overall earnings comparable to regulated electrics. We shall continue to look to such overall earnings and overall rates of

return allowed the electrics as a fruitful basis for our review of Bell's overall earnings in the future." 38 F.C.C.2d at 234. Thus, it is again reasonably inferable that 10.5% is within the "zone of reasonableness" when compared to the 12.5% earned by electric utilities.

Lastly, we note that despite criticisms of this analysis by AT&T, the Commission believed that the discounted cash flow (DCF) method for computing rate of return[8] was "a useful tool" when combined with "additional factors for safety, market pressure and other allowances that are essentially matters of judgment." Id. at 236. Two witnesses, Kosh and Myers, presented evidence based on DCF analysis. Kosh concluded that Bell's rate of return should be 9.75%. However, the Commission rejected this estimate as too low, especially since Kosh's analysis used a current cost of debt that was below the 7.25–7.5% found by the Commission. Myers, using the same current cost of debt as that found by the Commission and basing his conclusion on a DCF analysis combined with other methods, found that Bell's rate of return should be 10.5%. Id. at 236–37.

Contrary to the petitioners' impression, our reading of the opinion is that the Commission did not reject the great bulk of Myers' testimony, but rather held that his testimony was "entitled to substantial weight." Id. at 237. Thus, based on the acceptance of Myers' testimony, and of Kosh's testimony with an upward adjustment for a higher current cost of debt, the Commission's decision that the fair return on AT&T's equity was 10.5% is readily justifiable.

■ Petitioners finally argue that a 10% rate of return is just and reasonable

7. Roughly, interested coverage is the ratio of the company's annual earnings to the annual interest expense on its debt. Since utilities generally have a capital structure with a large portion of debt, and are generally considered safe investments, the greater the interest coverage, the safer the utility appears to be.

8. The DCF method for computing rate of return "relates the cost of equity capital to the expected future dividends paid by the firm on currently outstanding shares. The rate of return implicit in this stream of dividends is that discount rate which equates the present worth of the dividends to the current share price." J.A. Vol. II at 398. AT&T criticized this method on the ground that "by definition, [the DCF method] produces a capitalization rate which, if applied directly to book equity, will produce a market price equal to book equity." 38 F.C.C.2d at 236.

because AT&T has low risk characteristics and because its debt-equity ratio is lower than those of other regulated utilities. Petitioner's Br. at 22–24. However, the Commission considered these factors when it set the 10.5% figure. *See* 38 F.C.C.2d at 232–38. That reasonable persons evaluating the record could draw different inferences does not prove that the Commission was arbitrary and capricious or lacked substantial evidence. As our brethren on the District of Columbia Court of Appeals recently stated:

> This Court has an obligation to analyze the record to determine the possible presence of arbitrary action. Arbitrary action, however, is action not based on facts or reason. The burden upon petitioner is *not* merely to put forth an acceptable alternative but rather to demonstrate *clearly and convincingly* a fatal flaw in the action taken. Petitioner has not met that burden. He simply asserts a difference of opinion with the Commission. There has been no meaningful showing that the Commission was erroneous in its conclusion.

*Goodman v. Public Service Commission,* 309 A.2d 97, 101 (D.C.Ct.App.1973) (emphasis added, citations omitted); *accord, Goodman v. Public Service Commission, supra,* 497 F.2d at 666.[9]

### B.

■ Petitioners' second argument is that the Commission erred when it failed to adjust AT&T's overall rate of return because of the higher earnings of its subsidiary, Western Electric. However, petitioners' argument is not that the Commission committed a legal error, but

that it abused its discretion in failing to consider Western Electric's rate of return in Phase I of Docket 19129. We do not believe that this constituted an abuse of discretion. The issue is not whether the Commission must at some point consider the effect of Western Electric's earnings upon AT&T's earnings; all interested parties concede that this issue must be decided. Instead, the challenge here is directed to the manner in which the Commission's investigation should have been structured. As such, it fails.

■ Section 4(j) of the Federal Communications Act, 47 U.S.C. § 154(j) (1970) provides that "[t]he Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." By enacting section 4(j), Congress was " 'explicitly and by implication' delegating to the Commission power to resolve 'subordinate questions of procedure . . . [such as] the scope of the inquiry . . . .' " *FCC v. Schreiber,* 381 U.S. 279, 289, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383 (1965), *citing FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656 (1940). The Supreme Court has stressed that regulatory agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *FCC v. Pottsville Broadcasting Co., supra,* 309 U.S. at 143, 60 S.Ct. at 441 (footnote omitted).

■ Similarly, this court has upheld in the strongest terms the discretion of regulatory agencies to control the disposition of their caseload. Construing a

---

**9.** Intervenor, the Commonwealth of Pennsylvania, claims that the Commission's Phase I decision should be overturned and the case remanded for further proceedings because economic changes between issuance of the ALJ's Initial Decision and the full Commission's final decision—principally the imposition of economic controls by then President Nixon—rendered the record completely stale. We disagree. The Commission recognized the need to take notice of additional economic data and did so; it also held oral re-argument. *See* 38 F.C.C.2d at 220. A similar contention was re-

jected in *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), where the Supreme Court concluded that even though the ICC had not noticed more recent evidence, rehearings were a matter of discretion and the agency's failure to reopen a record could be set aside only in the most extraordinary of circumstances. *Id.* at 294–96, 95 S.Ct. 438. The Court noted that only once, in light of the Depression, had it reversed an agency's refusal to reopen its hearings based on a stale record. We do not find these circumstances here.

provision of the Federal Aviation Act similar to 4(j), we stated in *City of San Antonio v. CAB,* 126 U.S.App.D.C. 112, 374 F.2d 326 (1967) that:

> No principle of administrative law is more firmly established than that of agency control of its own calendar. . . . Consolidation, scope of the inquiry, and similar questions are housekeeping details addressed to the discretion of the agency and, due process or statutory considerations aside, are no concern of the courts. "Congress plainly intended to leave the Board free to work out application procedures reasonably adapted to fair and orderly administration of its complex responsibilities."

*Id.* at 329 (citations omitted). With these principles in mind, petitioners' contention verges on the frivolous and we accordingly reject it.

At the outset of Docket 19129, the Commission determined that the investigation would be divided into two phases, the second phase (Phase II) to include "the question whether the costs and expenses for Western Electric equipment and plant should result in earnings in excess of those necessary to give AT&T a fair rate of return." *Id.* No objections were raised to this procedural order. However, after the close of Phase I hearings, the Commission's trial staff, in its proposed findings of fact, suggested an adjustment to Bell's rate of return to account for the apparently greater rate of return earned by Western Electric. The Administrative Law Judge characterized the staff's action as "somewhat [of] an afterthought," and rejected the proposed adjustment because "the evidence [concerning Western Electric's earnings] seems to be fragmented and incomplete, insofar as the disclosure of facts and data that are necessary for a proper and accurate adjustment of the Bell System overall fair rate of return is concerned to account for Western Electric's earnings." 41 F.C.C.2d at 447. The Commission agreed with the ALJ, stating:

> We are not prepared on the basis of the limited record in this case to make the specific adjustment recommended by the Staff. We believe that this question warrants a *thorough* examination in Phase II which deals, among other things, with all ramifications of the relationship of Western Electric to the Bell system and its effect upon telephone rates and revenue requirements.

38 F.C.C.2d at 244 (emphasis added).

Despite petitioners' assertion that the record in Phase I was adequate to make the proposed adjustment to the rate of return, it can hardly be contended that the record was complete on this point. Moreover, there is no agreement that the appropriate course of action was to reduce AT&T's overall rate of return to account for the higher return of Western Electric.[10] *See* Br., Intervenor AT&T at

---

10. Since the thrust of parts I and II of the dissenting opinion of our distinguished colleague is that the Commission, by deferring the Western Electric investigation to Phase II, has failed to evaluate "a known material factor relevant to a reasonable rate of return," and has failed to make a downward adjustment that was likely to be required, we feel constrained to review the Commission's decision in some detail.

The dissent correctly observes that paragraph 101 of the Commission's opinion states that "Bell does not deny the validity of the Trial Staff's position." 38 F.C.C.2d 213, 244 (1972). However, the problem with this statement is that AT&T disputes its accuracy, and there is support for its position. At page 19 n. 21 of its brief, AT&T states:

> It is erroneous and misleading for Nader to assert that neither AT&T nor the Commission dispute that this adjustment should be made . . . . AT&T both contested the validity of this adjustment in its brief before the Commission and objected to its inclusion in Phase I without being given any notice or opportunity to make an evidentiary presentation.

The Administrative Law Judge in para. 110 of his Initial Decision supports AT&T's view of the record. 41 F.C.C.2d 389, 447 (1971). Essentially, the ALJ states that the trial staff proposed making this adjustment to AT&T's earnings because " 'Respondents [the Bell system] 'concede' the propriety of taking account in Phase I 'the actual return received by AT&T from its investment in Western Electric in de-

17–18. In any event, it is clear both from the Commission's November 1967 order instituting this investigation and from its Phase I decision, that it desired a thorough and searching inquiry into the entire relationship between AT&T and Western Electric. Only then would it determine whether an adjustment was appropriate and, if so, how that adjustment should be made. While the Commission would have been within the bounds of its discretion to have made the adjustment in Phase I subject to a further examination in Phase II, *see FPC v. Tennessee Gas Transmission Co.,* 371 U.S. 145, 154–55, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962), we certainly cannot say that it abused its discretion by deferring the entire question to Phase II.

In similar circumstances we have upheld the Commission's discretion to order its proceedings. In *Associated Press v. FCC,* 145 U.S.App.D.C. 172, 448 F.2d 1095, 1105–06 (1971), the petitioners challenged, *inter alia,* the Commission's deci-

sion to defer the Docket 18128 investigation into the lawfulness of certain Telpak tariff revisions, pending the outcome of the proceedings in Phase IB of Docket 16258.[11] The court affirmed the Commission's decision, finding the Commission's belief that the general proceeding should not be complicated by the inclusion of the issues relating to the Telpak tariffs was a rational basis for its actions. *Id.* at 1106.[12] This reasoning is equally applicable here. Under the circumstances, we believe it was reasonable for the Commission to decide that Phase I should not be burdened with the important question of the relationship between Western Electric and the Bell system's regulated components.

Moreover, the Commission made the revisions subject to an accounting and refund order, thus, protecting the interests of telephone users while the tariffs are being investigated. We recognize that there are shortcomings to accounting and refund orders. However,

termining how much in the way of earnings must be contributed by communications to meet the total earnings requirements of AT&T . . . .'" The ALJ then states that "[t]he 'rub' in all this is that . . . the Respondents [the Bell system] seem to deny the concession on the matter the Trial Staff evidently believed it had . . . ." *Id.*

It seems that the Commission erred in its statement in para. 101. While one could conceivably construe the record as supporting the proposition that AT&T did not deny the validity of the trial staff's position, they clearly *never admitted* its validity, contending that the entire question should be resolved in Phase II.

Moreover, we are reluctant to read too much into the Commission's para. 103. *See* 38 F.C. C.2d at 244. It is reasonably inferable that the Commission was not making a definitive decision on the method of making the Western Electric adjustment, but rather was only making the most tentative of observations. The Commission had not yet heard the different views on the matter and received the parties' evidentiary submissions. The evidence of record was fragmentary at best, consisting of little more than a few snippets of cross-examination. As indicated above, neither the ALJ nor the Commission believed that the record would support making an adjustment to AT&T's earnings. We find it hard to believe that such an adjustment could pass the muster of substantial evidence. Also, there is no indi-

cation that the Commission had considered any alternatives to a direct adjustment. The Commission had not yet considered what Western Electric's rate of return should be, whether there was a jurisdictional basis for making a direct adjustment, and whether adjustments, if any, should be made through the mechanism of intercompany prices.

In sum, there was no certainty as to the outcome of the Western Electric investigation. Under the circumstances, we do not believe that the Commission should be bound to a single course of action.

11. As discussed in Part I, the record in Phase IB was later incorporated into Docket 18128. 18 FCC 2d 761 (1969).

12. It is curious that in *Associated Press v. FCC,* 145 U.S.App.D.C. 172, 448 F.2d 1095, 1105 (1971), the Commission claimed that "the general proceedings [Phase IB of Docket 16258] should not be complicated by the inclusion of issues relating to the TELPAK tariffs [Docket 18128]," yet later transferred the record in Phase IB to Docket 18128 because:

effective testing of the complex economic theories of costing and pricing which have been advanced in this record, and the reconciling of opposing, or at least partially conflicting, views of expert witnesses, can best be accomplished by relating the principles advocated to specific proposals.

18 F.C.C.2d at 763.

the Supreme Court has recently observed that such provisions represent an accommodation between the industry's need for increased revenues and the public's interest in not paying excessive rates. *United States v. SCRAP,* 412 U.S. 669, 697–98, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). We can only reiterate this court's stated view concerning the adequacy of the accounting and refund mechanism that "the fault [if any] is with the statutory scheme, not with the Commission." *Associated Press v. FCC, supra,* 448 F.2d at 1106.

### III. The Issues in No. 73–2051

Petitioner in 73–2051, Microwave Communications, Inc. does not challenge the validity of the Commission's rate-of-return determination in Phase I of Docket 19129. Rather, MCI, in a singularly unenlightening brief virtually devoid of authority, apparently complains that the Commission violated sections 204 and 205 of the Federal Communications Act, 47 U.S.C. §§ 204, 205 (1970), and abused its procedural discretion by allowing AT&T to implement the Phase I decision solely through increased rates for its monopoly MTS and WATS services. A brief review of the statutory scheme is necessary in order fully to comprehend the import of MCI's contention.

■ The common carrier provisions of the Federal Communications Act, as other regulatory agency statutes, place primary responsibility for initiating rate revisions upon the carrier, who must provide at least thirty days notice to the Commission and to the public [13] and such information as the Commission may require. 47 U.S.C. § 203. Whenever a carrier initiates a tariff revision, the Commission, upon a complaint or on its own motion, may suspend the tariff for a maximum of three months while it investigates its lawfulness. 47 U.S.C. § 204. With respect to a validly filed carrier-initiated tariff revision, the Com-

mission is not vested with any suspension power other than the three month provision of section 204. *See AT&T v. FCC,* 487 F.2d 864, 876–81 (2d Cir. 1973). If the Commission has not completed its investigation by the end of the suspension period, the tariffs become effective; but the Commission may make the increases subject to an accounting and refund order.[14] Once the Commission has properly exercised the limits of its suspension power, the courts cannot further enjoin the effectiveness of the tariff. *See, e. g., United States v. SCRAP,* 412 U.S. 669, 697–98, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

■ Under section 204, the carrier has the burden of proving that the rates or practices being investigated are "just and reasonable." If, "after full opportunity for hearing," the Commission finds that the rates are not just and reasonable, 205(a) authorizes it "to determine and prescribe what will be the just and reasonable charge or the maximum or minimum, or maximum and minimum, charge or charges to be thereafter observed." Thereafter, the carrier may not "publish, demand, or collect any charge other than the charge so prescribed . . .." 47 U.S.C. § 205. Rates prescribed by the Commission may be invalidated by the courts. *See, e. g., AT&T v. FCC, supra; Moss v. CAB,* 139 U.S.App.D.C. 150, 430 F.2d 891 (1970).

■ At the outset, we are confronted by MCI's apparent confusion over the scope of the Commission's and our authorities. MCI maintains that this court must enter a decree instructing the Commission to order AT&T to refund all rate increases collected since November 22, 1973, because AT&T has failed to carry its burden of proving that increasing rates solely for MTS and WATS was just and reasonable under section 204. *See* MCI's Br. at 55–56. However, section 204 applies only to carrier-initiated rate revisions; until the Commission has

---

**13.** The requirement of notice to the Commission was subsequently expanded by rule to sixty days. 47 C.F.R. § 61.58 (1974). The validity of this modification was upheld in *AT&T v. FCC,* 503 F.2d 612 (2d Cir. 1974).

**14.** *See* note 3 *supra.*

determined that a rate is not just and reasonable, its only recourse is to suspend the tariff for up to three months and to impose an accounting and refund order. *See, e. g., AT&T v. FCC, supra,* 487 F.2d at 872–73. Since this court cannot order the Commission to act in a manner contrary to the statutory scheme, even if we concluded that the Commission had somehow violated section 204 or had otherwise abused its discretion, we could only order the Commission to reopen its hearings; the rate increases would remain in effect until the Commission determined whether they were just and reasonable.

■ Moreover, we must reject any contentions based on section 204. The Commission has stated that AT&T has the burden of proving in Docket 18128 that its competitive services are not being cross-subsidized by its monopoly services. 27 F.C.C.2d at 155–56. As we have previously indicated, Docket 18128 is an exhaustive investigation into the ratemaking principles that should be applied in determining the rate relationships among the various classes of services that AT&T provides. By saying that AT&T has not met its burden in Docket 19129, MCI implies that Docket 18128 must be duplicated in Phase I to satisfy the statute. There is absolutely no merit to this contention. In effect, if MCI is relying on section 204, its objection is little more than a complaint concerning the Commission's procedures for disposing of its caseload. We have already recognized the great discretion afforded the Commission in its efforts to adjudicate complex issues.[15] We do not detect any abuse of discretion or violation of section 204 in the Commission's decision to adjudicate the cross-subsidization issue in Docket 18128.[16]

In response to this reasoning, MCI vigorously argues that the Commission prescribed AT&T's new rates under section 205, a position logically inconsistent with its section 204 contention. If the Commission has prescribed AT&T's *rates and charges,* then the issue before us is not whether AT&T met its burden of proof, but whether there has been "a full opportunity for hearing" under section 205.[17] However, before we even begin to consider the latter problem, we must make the threshold determination of whether there has been a prescription.

■ MCI's position, articulated principally in its reply brief, is that the Commission unlawfully prescribed rates and charges within the meaning of section 205. Drawing on the principle that whether the agency has prescribed a rate must be determined by looking at the practical consequences of its actions, *Consolidated Edison Co., Inc. v. FPC,* 168 U.S.App.D.C. 92, 99–103, 512 F.2d 1332, 1339–43 (1975); *Moss v. CAB, supra,* 430 F.2d at 895–900 (1970), MCI first points to the following Commission actions as unequivocally demonstrating that the Commission prescribed AT&T's rates under section 205: 1) Docket 19129 was instituted pursuant to the Commission's power under section 205 as well as under section 204; 2) the Administrative Law Judge characterized his Initial Decision as a "prescription of a fair overall rate of return for Bell . . .." 41 F.C.C.2d at 448; 3) the Commission, after determining that 8.5% would be a fair rate of return, rejected AT&T's November 20, 1970 filing which was premised on a higher rate of return, but also authorized AT&T to file new tariffs designed to raise $145 million in additional revenue; and 4) the Commission ordered AT&T only to file tariffs that were consistent

---

**15.** *See FCC v. Schreiber,* 381 U.S. 279, 289, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965); *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 138–43, 60 S.Ct. 437, 84 L.Ed. 656 (1940); *City of San Antonio v. CAB,* 126 U.S.App.D.C. 112, 374 F.2d 326, 329 (1967); and Part II–B *supra.*

**16.** In light of our conclusion that the Commission did not abuse its discretion by not considering the cross-subsidization issue in Phase

I, we think that the Commission correctly excluded the testimony of MCI's expert on the ground that the proffered testimony was not relevant to the rate-of-return issue. 38 F.C.C.2d at 492–93.

**17.** Of course, the prescription must be supported by substantial evidence. However, the parties do not claim that the Phase I decision lacks substantial evidence.

with its Phase I decision and required AT&T to submit tariffs implementing Phase I to the Commission for review. MCI's Reply Br. at 15, 18, 22. Next, MCI claims that the Commission has literally prescribed AT&T's charges under section 205 essentially because fixing a rate of return determines rates and fixing rates determines rate of return. *Id.* at 18. Finally, it argues that the prescription is unlawful because there has not been a full opportunity for a hearing on the issue of the allocation of the rate increases as required by section 205. Thus, according to MCI, the Commission could not lawfully allow AT&T to implement Phase I until the issues in Phase II and in Docket 18128 were decided, and that the $395 million rate increase allocated solely to MTS and WATS is unlawful.[18]

The Commission has been placed at a disadvantage in defending its order. In its brief to this court, it maintains that its Phase I decision is not a prescription of rates. However, its presentation is necessarily limited since it was replying to arguments that were only hinted at in MCI's opening brief. Moreover, the Commission's argument was initially clouded by MCI's representation that the Commission's position in this circuit is inconsistent with its position in a case that was pending before the Second Circuit, *AT&T v. FCC*, 519 F.2d 322 (2d Cir.).[19] To assess the full import of the Commission's position, we ordered those parties in the Second Circuit who are also parties in the case *sub judice* to submit their briefs to this court.

The Commission contends that while it did not prescribe rates or rate schedules in Phase I of Docket 19129, it did prescribe a rate of return. This action, which the Commission maintains is fully consistent with section 205, left AT&T with complete freedom to determine the composition of its revenue structure, pending the outcome of Docket 18128 and Phase II, as long as its rate of return did not exceed 8.5%.

AT&T, an intervenor in the case *sub judice* and petitioner in the Second Circuit proceeding, takes yet a third position in opposition to those of MCI and the FCC. In its brief to this court, AT&T argues, as did the Commission, that the FCC did not prescribe rates or rate schedules. However, in the Second Circuit, AT&T departs with the Commission and not only maintains that the Phase I decision was not, in fact, a prescription of AT&T's rate of return under section 205, but also that the FCC has no authority to prescribe rates of return. Thus, AT&T would agree with the Com-

---

**18.** It is somewhat anomalous for MCI to argue in this court that the rate increases allowed to AT&T are unlawful because the prescription was invalid, and, at the same time, argue to the Second Circuit that the Commission properly rejected AT&T's January 3, 1975 tariff filing based on its Phase I prescription. *See* note 19 *infra.*

**19.** On January 3, 1975, AT&T filed tariff revisions with the Commission designed to increase its revenues from interstate services by approximately $717 million. On February 27, 1975, the FCC issued a press release (Report No. 1751) stating that the Commissioners had voted to

allow the American Telephone and Telegraph Company to file tariffs increasing its annual revenues from interstate operations by $365 million before taxes. In doing so, it rejected AT&T's proposal to increase its annual pre-tax revenues by $717 million.

The Commission in 1972 had prescribed an overall rate of return for interstate opera-

tions of 8.5 percent based on then-prevailing costs of capital. In allowing the present increase, the Commission took cognizance of the fact that economic conditions had changed significantly since 1972.

Under these circumstances, the FCC concluded it should modify its 1972 prescription to allow AT&T to increase its rate of return to 8.74 percent . . . . .

The Commission, absent a hearing, was unable to determine to what extent, if any, AT&T's cost of equity had increased and, therefore, set this question for hearing on an expedited basis . . . . . .
On March 6, 1975, the Commission released a memorandum opinion and order, 51 FCC 2d 619 (1975), in which it formally rejected AT&T's tariff finding. AT&T appealed to the Second Circuit.

However, on July 8, 1975, the Second Circuit ruled that the case should be transferred to the District of Columbia Circuit. *AT&T v. FCC*, 519 F.2d 322 (2d Cir. 1975).

mission that it was free to use its discretion in allocating the rate increases among the classes of interstate service, subject to the outcome of Docket 18128. The significance of AT&T's attack on the Commission's decision is that a valid prescription order would limit for some period the carrier's discretion to initiate rate revisions. *See*, 47 U.S.C. § 205(a); *AT&T v. FCC, supra*, 487 F.2d at 880–81.

We cannot agree with MCI that the Commission has literally prescribed rates, for the charge itself cannot be equated with a rate of return. The Commission, in carrying out its statutory responsibility to ensure that the carrier's charges are just and reasonable, attempts to set rates at a level that will cover the carrier's cost of service including a fair return to the utility's stockholders. *See*, 38 F.C.C.2d at 226–27, 248–51; 9 F.C.C.2d at 51–52, 111–15; *J. Bonbright, Principles of Public Utility Rates*, at 135–36 (1961). For a diverse utility such as AT&T, with different classes of services, many combinations of rates could raise sufficient revenue to cover its costs, including the cost of raising capital. However, carriers may not unjustly or unreasonably discriminate against classes of services, 47 U.S.C. § 202 (1970), and thus the actual rate structure chosen must be free from unreasonable discrimination.

The Supreme Court, recognizing that prescribing rates involves a number of steps, one of which is the establishment of a fair rate of return, has stated:

> The establishment of a rate for a regulated industry often involves two steps of different character, one of which may appropriately precede the other. The first is the adjustment of the general revenue level to the demands of a fair return. The second is the adjustment of a rate schedule conforming to that level so as to eliminate discriminations and unfairness from its details.

*FPC v. Natural Gas Pipeline Co., supra*, 315 U.S. at 584, 62 S.Ct. 736, at 742. Thus, MCI's claim that a rate of return is equivalent to rates must be rejected since a rate of return is merely one component of a rate. It is clear that in Phase I the Commission intended only to decide what AT&T's fair rate of return should be. It left the utility free to determine what combination of rates would achieve the new level. Although the Commission stated that it expected AT&T to follow sound ratemaking principles in deciding how to allocate the incidence of the increases, it refused to decide the allocation issue, and hence, the cross-subsidization issue, prior to completing Docket 18128. 38 F.C.C.2d at 985. Moreover, the fact that the Commission ordered AT&T to submit its proposed increases for review does not mean that the Commission prescribed those increases. A carrier is always required to submit its tariffs for review so that the Commission can determine if it should exercise its suspension power. *See*, 47 U.S.C. §§ 203(a), (b), 204.

Although we cannot agree with MCI that the Commission in Phase I prescribed rates, the factors cited by MCI do suggest that the Commission intended to prescribe AT&T's rate of return. We would be shirking reality if we did not recognize that the practical effect of the Commission's Phase I order was to limit prospectively AT&T's rate of return to 8.5%, and thus was a prescription under section 205. Were the Commission acting pursuant to section 204, which provides for inquiry into the lawfulness of carrier-initiated tariff revisions, its statutory obligations would have been fulfilled by a finding that the carrier had met its burden of proving that the tariff provisions were "just and reasonable." This requirement could easily have been met in this case by a Commission finding that the 9.5% rate of return upon which AT&T's November 20, 1970 filing was predicated [20] was not supported by the

---

**20.** As discussed in Part I, AT&T's November 20, 1970 tariff filing was designed to raise $545 million through rate increases of $385 million and cost savings of $160 million. *See* n. 2 *supra*.

record while the revised filing was.[21] The Commission would have then rejected the initial tariff as unlawful, leaving AT&T to file new tariffs at some unspecified lower level if it chose. However, the Commission went further than a mere rejection of the carrier's initial tariff; it affirmatively decided that 8.5% was the minimum reasonable rate of return necessary for the Bell system and translated that figure into the additional revenue required—$145 million. While the carrier still remained free to determine how to allocate the burden of its increases, it is abundantly clear that the Commission would have summarily rejected any tariff revision that was designed to raise more than $145 million. Reviewing the rate increases that AT&T filed in response to Phase I, the Commission stated: "The essential and single issue before us at this time is whether AT&T has made a sufficient showing that its proposed rate schedules have been reasonably designed to afford it the revenue relief in the amount we determined in Phase I of this proceeding to be required." 38 F.C.C.2d at 985. Moreover, in light of AT&T's demonstrated need for a higher rate of return, the pressure was enormous for AT&T to file tariffs conforming to the Commission's Phase I order. Indeed, AT&T may well have believed that it had no other choice, since it fully complied with the Commission's Phase I order. *Compare Consolidated Edison Co., Inc. v. FPC, supra,* 512 F.2d at 1339–41 *with Moss v. CAB, supra,* 430 F.2d at 897.

 In light of the Commission's actions in implementing its Phase I decision, any other interpretation is unpersuasive. The case law is in agreement that the Commission need not explicitly announce its action as a prescription to have that effect. *See AT&T v. FCC, supra ; AT&T v. FCC,* 449 F.2d 439 (2d Cir. 1971); *Moss v. CAB, supra.* Moreover, we are at a loss to explain the effect of the Commission's Phase I deci-

sion if it was not intended to have a prospective effect. It is, of course, a cardinal principle of ratemaking that a utility may not set rates to recoup past losses, nor may the Commission prescribe rates on that principle. *See, e. g., Galveston Electric Co. v. Galveston,* 258 U.S. 388, 395, 42 S.Ct. 351, 66 L.Ed. 678 (1922). Therefore, when the Commission ruled that AT&T could earn a return of 8.5% and allowed AT&T to increase its revenues by $145 million to achieve that return, the Commission necessarily must have intended its decision and order to have the prospective effect of a prescription, thus, limiting the utility to that return.

Nothing in the conclusion that the Commission prescribed a rate of return under section 205 is inconsistent with the doctrine of *Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Railway Co.,* 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932). *Arizona Grocery* concerned whether under the reparations provisions of the Interstate Commerce Act, a shipper could recover charges under a rate that had admittedly been prescribed by the ICC. *Id.* at 381, 52 S.Ct. 183. Whether the ICC's order was a prescription *vel non* was not at issue. Further, the holding of *Arizona Grocery* is consistent with our holding that the Commission prescribed AT&T's rate of return. In that case, the Supreme Court held that once the ICC had prescribed a maximum rate, which by statute must be the maximum reasonable rate, it could not thereafter claim that a carrier's duly filed rate below the prescribed maximum was unreasonably high. *Id.* at 387–89, 52 S.Ct. 183.

 Similarly, although the Commission made AT&T's rates subject to an accounting and refund order, the *Arizona Grocery* doctrine protected AT&T from having to refund revenue collected on the ground that an 8.5% overall rate of return was unreasonably high. However, AT&T would not be protected from

---

21. The reader may recall that on January 12, 1971, AT&T agreed to postpone the effectiveness of its November 20, 1970 tariff filing and

instead filed tariff revisions designed to increase revenues by $250 million.

a refund order on cross-subsidization grounds, since the Commission has not yet prescribed the rate relationships among the classes of AT&T's interstate services.[22]

Having decided that the Commission prescribed a rate of return for AT&T in Phase I, we confront another difficult question in determining whether the Commission could validly do so. On its face, section 205 only authorizes the Commission to prescribe charges, classifications, regulations and practices, not rates of return; implicit in this literal reading of the statute is the proposition that the Commission must determine each cost component of a rate or charge before it may make a prescription. Thus, under this interpretation, the Commission could not validly prescribe charges until it had concluded its Phase I, Phase II, and Docket 18128 investigations.

Although section 205 does not authorize the Commission to prescribe rates of return, we think that any literal interpretation would be overly simplistic. While section 205 does empower the Commission to prescribe just and reasonable charges, "it does not specify the means by which that regulatory prescription is to be attained." *FPC v. Texaco, Inc.*, 417 U.S. 380, 387, 94 S.Ct. 2315, 2321, 41 L.Ed.2d 141 (1974). Moreover, analyzing the cognate provisions of the Federal Power Act, the Supreme Court has observed that the "width of administrative authority must be measured in part by the purposes for which it was conferred," and that the " 'legislative discretion implied in the rate making power necessarily extends to the entire legislative process, embracing the method used in reaching the legislative determination as well as that determination itself.' " *Permian Basin Area Rate Cases, supra,* 390 U.S. at 776, 88 S.Ct. at 1364 (citations omitted). The discretion that must be afforded the Commission in the exercise of its ratemaking power is enhanced by section 4(i) of the Communications Act, 47 U.S.C. § 154(i) (1970), which gives the Commission the power to "issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions." Thus, our inquiry is whether the Commission's rate of return prescription is proper under section 4(i).

In discussing MCI's contention that a rate of return determination was the same as a determination of rates, we observed that in *FPC v. Natural Gas Pipeline Co., supra,* 315 U.S. 584, 62 S.Ct. 736, 86 L.Ed. 1037 (1942) the Supreme Court recognized that ratemaking often

---

**22.** *Arizona Grocery* and the other ICC cases, *Atlantic City Electric Co. v. United States,* 306 F.Supp. 338 (S.D.N.Y.1969), *aff'd by equally divided Court,* 400 U.S. 73, 91 S.Ct. 259, 27 L.Ed.2d 212 (1970); *Algoma Coal & Coke Co. v. United States,* 11 F.Supp. 487 (E.D.Va.1935), are distinguishable for another reason, the peculiarities of ICC practice. Unlike the Federal Communications Commission, the Interstate Commerce Commission has the power to award reparations to shippers injured by unreasonable charges. 49 U.S.C. § 16(1) (1970). Moreover, the Supreme Court has held that the section 15a(2) of the Interstate Commerce Act, 49 U.S.C. § 15a(2) (1970) authorized the ICC to conduct general revenue proceedings on a nation-wide or group-wide basis. Section 15a(2) was construed to mean that the ICC could consider whether rates were reasonable among the group generally, without considering the reasonableness of specific rates of each carrier. *United States v. Louisiana,* 290 U.S. 70, 75–77, 54 S.Ct. 28, 78 L.Ed. 181 (1933).

This power was in addition to the ICC's power to examine the specific rates of a carrier, determine whether they were just and reasonable, and award reparations if they were not. Both *Atlantic City Electric Co.* and *Algoma Coal & Coke Co.* involved litigation pursuant to the Commission's authority to prescribe group-wide or area-wide increases. Since, in each case, the ICC did not purport to pass on the reasonableness of the increases for specific carriers and specifically reserved that question for future consideration, the courts agreed with the ICC that general revenue proceedings were not prescriptions within the meaning of *Arizona Grocery.* However, since the Federal Communications Act does not contain a provision similar to 49 U.S.C. § 15a(2), and since in the case *sub judice* the FCC was reviewing the specific rate increases of one company, the ICC cases are inapplicable. *Cf. Moss v. CAB,* 139 U.S.App.D.C. 150, 430 F.2d 891, 898 n. 30 (1970).

required several consecutive proceedings. Moreover, the *Natural Gas Pipeline* holding was reaffirmed in *FPC v. Tennessee Gas Transmission Co.,* 371 U.S. 145, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962), wherein the Court upheld the Federal Power Commission's decision to investigate Tennessee Gas' rate revisions in phases and to implement its rate of return conclusion before considering how to allocate revenues and costs among the different classes of the utility's services.

These cases and numerous others recognize that ratemaking is a complex and difficult task. Under the cost-of-service method of rate regulation applied here, not only must the Commission determine the allowable rate of return, but it must also determine whether: 1) the utility's investment is properly calculated and efficiently incurred; 2) the level of cash expenses is honestly, efficiently, and economically incurred; 3) the level of noncash expenses such as depreciation and other accruals is properly reflected in the rate calculation; and 4) the rates proposed or in effect actually cover these costs and produce a fair rate of return. *See generally, J. Bonbright, Principles of Public Utility Rates, supra,* 66–108. Additionally, the Commission must see that the rates themselves are not unjustly or unreasonably discriminatory.

Obviously, reaching a decision on each of the components that make up a rate is a time-consuming task, especially when the Commission undertakes to re-evaluate the economic principles for making these determinations. If the Commission can effectuate its decision as it adjudicates each component of the rate, the public more rapidly receives the benefit of the protection inherent in the Commission's authorization to prescribe just and reasonable charges. Therefore, we believe that the Commission's Phase I order prescribing AT&T's rate of return was in the public interest, necessary

for the Commission to carry out its functions in an expeditious manner, and within its section 4(i) authority.

Moreover, we do not believe that this conclusion is at all inconsistent with section 205 or any other provision of the Federal Communications Act. Clearly, there is no explicit statutory prohibition against prescribing a rate of return. Additionally, since the rate of return is one component of a charge, and the charges prescribed must properly reflect the allowable rate of return, the prescription of a rate of return is fully consistent with the prescription of charges. *Compare AT&T v. FCC, supra.* These factors convince us that within the power to prescribe charges is the power to determine and prescribe those elements that make up the charge.

The essential elements of a valid prescription order are a full opportunity to be heard and a finding that the action taken is just and reasonable.[23] *AT&T v. FCC, supra,* 487 F.2d at 874, *quoting AT&T v. FCC, supra,* 449 F.2d at 450. There can be no doubt that AT&T had a full hearing on the rate-of-return issue and has not appealed that determination. Additionally, although the Commission did not use the just and reasonable terminology, it found that 8.5% was AT&T's "fair rate of return," 38 F.C.C.2d at 245, which to the Commission meant:

> the minimum required by Bell to enable it to attract capital at a reasonable cost and to maintain the credit of Bell; and to assure continued, adequate and safe interstate and foreign communications service to the public.

. . . .

*Id.* We think that this is the equivalent of just and reasonable.[24]

We hold today that the Commission lawfully prescribed a rate of return for AT&T.[25] Without intimating any

23. *See* n. 17 *supra.*

24. We have considered the arguments of the many intervenors, including the numerous arguments presented by the Telephone Users Association, Inc. We find these contentions to

be without merit and see no need to devote any substantial time to discussing them.

25. In light of the dissenting opinion, we are constrained to make several observations about our holding. First, the rate of return

view concerning the validity of the Commission's rejection of AT&T's January 3, 1975 tariff filing,[26] we recognize as a general proposition that such a prescription cannot remain binding indefinitely without agency reevaluation, especially during periods of rapidly changing economic conditions.

### IV. Sua Sponte Considerations

█ Although we have affirmed the Commission on all issues raised, we are concerned, as are the petitioners, with the Commission's failure to conduct these proceedings within a reasonable time frame.

Nader and Robertson strongly imply that the source of their objection to the Commission's failure to account for Western Electric's earnings in Phase I lies in their doubts that a Phase II decision will soon if ever be forthcoming. *See Petitioners' Br.* at 30. They have valid reasons for their skepticism. The Commission first promised in 1965 that it would examine the reasonableness of Western Electric's prices and earnings.

*See* 2 F.C.C.2d at 143; 9 F.C.C.2d at 33. Five years later when the Commission instituted Docket 19129, it noted that a review of Western Electric's prices and earnings was already underway in Phase II of Docket 16258 and that it intended to conduct a further investigation into Western Electric's earnings in Phase II of Docket 19129. 27 F.C.C.2d at 156. However, instead of moving forward with Phase II, the Commission dismissed it and the associated proceedings in Phase II of Docket 16258, 32 F.C.C.2d 691–701 (1971), for the following reasons:

> we do not have sufficient resources to permit adequate staffing of the hearings that would be involved or to complete the preparatory staff work required for developing a meaningful evidentiary record on these issues. This is the result of the continuing growth in the volume and complexity of regulatory problems within the common carrier field.

*Id.* at 692.[27] Later, the Commission reconsidered and announced that it was

---

prescribed by the Commission was 8.5%, not a rate as high as 9.0%. While the Commission stated that in order to encourage AT&T to be more efficient, it would not automatically investigate earnings in the range of 8.5–9%, "the filing of a tariff designed to produce a rate of return in excess of 8.5% is *prima facie* unlawful." 51 F.C.C.2d 619, 627 (1975). Secondly, by holding that the Commission's Phase I decision was a valid prescription of a rate of return, we are supporting the Commission's own characterization of its proceedings. *See id.* at 625; Part III of this opinion. The Commission now argues, and we agree, that the portion of its brief cited by the dissent for the contrary proposition, only supports the argument that Phase I was not a prescription of rates, not that there was no prescription at all. Lastly, although the effect of the prescription is to protect AT&T from the possibility of refunds on the ground that an 8.5% rate of return was too high, the Commission retains full latitude to order refunds on all other grounds, including improper exclusions from income, excessive expenses, improper inclusions in the rate base, and cross-subsidization between and within the classes of service, to name a few. These are powerful tools and we perceive no diminution of the public's protection by our holding.

**26.** *See* n. 19 *supra.*

**27.** Commissioner Johnson vehemently dissented on managerial and substantive grounds, stating in part:

> I must admit that it is difficult to be confident about what the priorities of the FCC should be. I am a little surprised that my colleagues can be so sure. This agency has never attempted to determine what the totality of agency programs and projects are, what resources . . . are required to meet the program needs, what the outputs and goals of the various programs and projects are, what alternatives there are to doing the present programs and projects, and finally, what difference it makes to assign alternative priorities, in terms of the goals of the agency. We do not now have this information for the agency as a whole, nor for the common carrier activity in particular . . . .. My objection is that the decisions on what to do are not made rationally and systematically. It has not been done in the budgetary process, it has not been done in managerial control of agency activity, and it is not being done here.

> 32 F.C.C.2d at 696–97.

re-instituting Phase II. 33 F.C.C.2d 267 (1970). Despite its reconsideration, the Commission has not shown a disposition to expedite Phase II. It is now ten years since the FCC's first promise, and we are told that the issues in Docket 19129 are not even close to resolution. *See Petitioners' Br.* at 30 (As of date of filing the brief, April 5, 1974, Phase II hearings had not yet begun).

MCI has even more reason to complain for it claims that nothing less than its continued survival and the survival of other specialized carriers is at stake. As we discussed earlier, MCI claims that AT&T is able to cross-subsidize its competitive services with its monopoly services. It points to the fact that the very reason for the Commission's 1965 general investigation into AT&T's rates was the seven-way cost study which showed wide variations among the returns earned by AT&T's investment in monopoly and competitive service. 2 F.C.C.2d 871. MCI reminds us that after four years of extensive investigation, the FCC transferred the cross-subsidization issue from Phase IB of Docket 16258 to Docket 18128, *see* 18 F.C.C.2d 761, where it has languished for an additional six years, again without a decision in sight.[28]

We are sympathetic with MCI's characterization of Docket 18128 as "an interminable proceeding, the principal function of which has been that of a giant regulatory wastebasket." MCI's Reply Br. at 8. Though unwilling to impute ill motives to the Commission, we are constrained to agree with MCI on the following point:

> nine years should be enough time for any agency to decide almost any issue. There comes a point when relegating issues to proceedings that go on without conclusion in any kind of reasonable time frame is tantamount to refusing to address the issues at all—and the result is a denial of justice.

*Id.* at 8–9.

■ Under the Administrative Procedure Act, administrative agencies have a duty to decide issues presented to them within a reasonable time, 5 U.S.C. § 555(b) (1970), and reviewing courts have a duty to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *see Environmental Defense Fund, Inc. v. Hardin,* 138 U.S.App.D.C. 381, 428 F.2d 1093, 1099 (1970). Although the issues are complicated, we can find no justification for a delay of ten years. We agree with then Commissioner Johnson's assessment:

> It is nothing short of amazing that this agency has been able to conduct two major AT&T rate of return proceedings while being unable to finish either the ten-year-old proceeding to decide whether the average citizen is paying too much for interstate service while special users get a rate subsidy, or the proceeding begun in 1965 to determine the appropriateness of Bell's costs. . . .

38 F.C.C.2d at 273 (Dissenting Statement of Commissioner Johnson).

Other harmful effects may also accrue from the Commission's dilatory pace. Until it rules on the lawfulness of a rate, its sole remedial power is to subject the filed tariff to an accounting and refund order. While there is much merit to this procedure, it is far from perfect. First, it does not protect specialized carriers from the discriminatory tactics that they claim AT&T is using. If the Commission ultimately determines that Bell's MTS rates are too high and the private line rates too low, MTS users will receive a refund, but AT&T's competitors will not be compensated for loss of business. Second, if at some future date a refund is ordered, its magnitude could be staggering. To date, AT&T has well over one billion dollars of revenue subject to accounting and refund, and this figure grows at the rate of four hundred million annually. Finally, the present inflationary trend is causing regulated industries to seek rate revisions more frequently than in the past—AT&T sought and received interim increases in 1970,

---

**28.** *See* n. 12 *supra.*

1972, and in February of this year. The Commission's inability to determine the lawfulness *vel non* of these increases within a reasonable time suggests that it verges on losing its ability to effectively regulate at all.

This court has cautioned the Commission that it must pick up the pace of its proceedings. *See Lebanon Valley Radio, Inc. v. FCC,* 164 U.S.App.D.C. 105, 503 F.2d 196, 201 (1974) ("We presume the Commission will proceed expeditiously so that this proceeding may reach a final conclusion before it enters its second decade."); *Fidelity Television, Inc. v. FCC,* 164 U.S.App.D.C. 441, 445, 450, 502 F.2d 443, 447, 452 (1974). We must do so again in the strongest terms, for we foresee the breakdown of the regulatory process if the public and the regulated carriers must wait as long as ten years to have important issues decided.

Therefore, we will require that within thirty days from the issuance of this opinion, the Commission submit a schedule for the orderly, expeditious resolution of the lawfulness of AT&T's tariff filings of January 14, 1971 and December 1, 1972. This schedule shall include the Commission's proposed timetable for disposing (1) of Phase II of Docket 19129, (2) of Docket 18128 to the extent necessary to determine the lawfulness of the instant tariff revisions, and (3) of any other docket, to the extent necessary to resolve the issues presented herein. Within ten days of the Commission's submission, any party to these consolidated cases may file comments. Thereafter, the court shall either approve or reject the Commission's schedule or make such further orders as appropriate. After a schedule of proceedings has been approved, the Commission will be expected to adhere to it; any alterations will require the approval of this court and the Commission will be required to explain any and all material failures to comply. The division shall retain jurisdiction solely to ensure compliance.

*So ordered.*

FAHY, Senior Circuit Judge (dissenting):

## I

By its order of November 22, 1972, the Commission authorized AT&T to submit new rate schedules to effectuate another interim increase in its rate of return, set by the order at 8.5%–9%. This was to enable AT&T to realize annually $145 million in addition to the January, 1971 interim increase allowed of $250 million, thus approving a total yearly earnings increase of $395 million. The earnings of AT&T's wholly-owned subsidiary Western Electric—constituting a known material factor relevant to a reasonable rate of return—were not evaluated as they might affect the appropriate rate of return. Such evaluation was deferred to be considered in Phase II. In this connection the Commission stated in its finding No. 103 accompanying the November 22 order:

103. We agree with the Staff that it would be appropriate for the Commission to take into account the return received by AT&T from its investment in Western Electric in determining the rate of return for interstate and foreign communication service. However, we are not prepared on the basis of the limited record in this case to make the specific adjustment recommended by the Staff. We believe that this question warrants a thorough examination in Phase II which deals, among other things, with all ramifications of the relationship of Western Electric to the Bell System and its effect upon telephone rates and revenue requirements. Accordingly, we conclude that it is not appropriate for us to make any adjustments in Bell's rate of return with respect to Western Electric's earnings in this proceeding.

The deferment has continued and its end is not in sight. The result is that each year AT&T's income and rate of return may be, and according to information available when the November 22 order was entered, are likely to be, in

excess of a just and reasonable amount. The consumer interest thus clearly involved is a basic interest entitled to protection by the Commission, qualified as it is by the need for a rate of return which enables the regulated utility "to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed. . . ." *Power Commission v. Hope Gas Co.*, 320 U.S. 591, 605, 610, 612, 64 S.Ct. 281, 289, 88 L.Ed. 333 (1944). No reason appears for believing that these needs outweigh the consumer interests in the matter now considered.

The court holds that the rate of return was "prescribed" by the Commission. The court then further holds that under the decision of the Supreme Court in *Arizona Grocery v. Atchison Ry.*, 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932), AT&T is protected, with an exception to be noted, from accountability to refund any realization of income on the basis that the rate of return it was allowed was unreasonably high. The opinion of the court states:

. . . although the Commission made AT&T's rates subject to an accounting and refund order, the *Arizona Grocery* doctrine protected AT&T from having to refund revenue collected on the ground that an 8.5% overall rate of return was unreasonably high. However, AT&T would not be protected from a refund order on cross-subsidization grounds, since the Commission has not yet prescribed the rate relationships among the classes of AT&T's interstate service. (Footnote omitted.)

I do not interpret the proceedings to have the result thus attributed to them upon the authority of *Arizona Grocery*. In *Arizona Grocery* a rate, not a rate of return as here, had been unqualifiedly fixed by the Interstate Commerce Commission; and there was no deferment, as here, of evaluation, as it might affect the rate of return, of a material factor known by the agency at the time to be relevant to the decision reached. It followed from the statutory plan, as the Court held, that reparations could not be

recovered from the carrier by a shipper who had been required to pay the rate which had been fixed as reasonable, although in new proceedings it was found to have been unreasonable. That the earnings of Western Electric were known when the November 22 order was entered to constitute a material and relevant factor respecting the rate of return, and were explicitly deferred for evaluation in that respect, appears from finding No. 103, *supra*. The brief of the Commission in this court states the matter as follows:

In its decision the Commission agreed in principle with the Trial Staff's contention that Western Electric's earning be taken into consideration [in determining the rate of return. See finding 103, *supra*.] but it refused to make the specific adjustment recommended on the basis of the very limited record evidence. Rather the Commission stated that this question should be the subject of "a thorough examination in Phase II which deals, among other things, with all ramifications of the relationship of Western Electric to [AT&T] and its effect upon telephone rates and revenue requirements." *AT&T*, 38 FCC 2d 213, 244 (A. 96). Since the rate adjustments made at the conclusion of the rate of return phase were of an interim nature, not prescribed by the Commission, and subject to accounting and possible refund, the public was protected. (Footnote omitted.) (Bracketed language added.)

I think protection of the consumer interest requires in this situation accountability by AT&T, should it be found in the proceedings still to be concluded that the 8.5%–9% rate of return was unreasonably high due to the omission to evaluate the effect of the earnings of Western Electric. While actual refunds to consumers might be impossible, it would be well within the powers of the Commission, as of the court, to make an appropriate remedial provision to inure to the general benefit of the consuming public should a downward adjustment be found

appropriate. *Cf. Bebchick v. Public Utilities Commission,* 115 U.S.App.D.C. 216, 318 F.2d 187, 203–204 (1963). Such a provision would seem also to be within the literal scope of paragraph 124 of the Commission's own order of November 22, in its reference to "such findings as we may make in Phase II hereof and Docket 18128," although I cannot be certain as to the Commission's intention in the use of this language in the full context of paragraph 124.[1]

As stated *infra* in Part II I agree with dissenting Commissioner H. Rex Lee that the earnings of Western Electric, constituting a source of revenue to AT&T, are a Phase I factor. The position I take, however, avoids the necessity of deciding whether the failure of the Commission to evaluate those earnings in Phase I fatally flaws the rate of return portion of the November 22 order, since I would interpret the proceedings as leaving open the issue of the reasonableness of the rate as it might be affected by the Western Electric earnings.

It seems to me that our case in no respect is governed by *Arizona Grocery.*

The authority of the Commission to structure its proceedings in such a case as this must be recognized. The exercise of such authority is accompanied, however, by a responsibility in the end not to separate the inseparable. The court in my opinion should not give a status of unconditional finality to the rate of return allowed in Phase I when the Commission then knew that the earnings of Western Electric were a material and relevant factor which might require a downward adjustment in the percentage then allowed. A right to defer evalua-

tion of the effect of those earnings I think did not dissolve the relationship of this source of revenue to the appropriate rate of return to be realized.

## II

While I would not now approve the increase in the rate of return allowed by the order of November 22, neither would I now set it aside. Since the earnings of Western Electric which AT&T was then receiving and continues to receive, have not been evaluated as they bear upon the reasonableness of the increase, as well as upon the implementing rates, I would either defer decision as to the justness and reasonableness of the increase or in the alternative require the Commission within a period fixed by the court to render an informed judgment respecting it, the court in the meanwhile to withhold its decision. In this situation "the zone of reasonableness" latitude allowed the Commission is irrelevant to the appropriate response the court should now make to the November 22 order. As noted above, I agree with dissenting Commissioner H. Rex Lee that the Western Electric earnings are a Phase I subject,[2] a position inherent also in the dissent of Commissioner Johnson; but even on the assumption the matter was reasonably relegated to Phase II, the omission of the Commission as yet to reach any decision with respect to it I think calls upon the reviewing court to defer its own decision. The importance of the Western Electric earnings is recognized. In findings Nos. 101 and 102 accompanying its order the Commission states that its Trial Staff, "recommends a further downward adjustment in Bell's

---

1. The full text of paragraph 124 follows:

 124. IT IS FURTHER ORDERED. That such rate increase proposal which the Commission may allow to become effective shall be subject without further order of the Commission to the same accounting and refund provisions heretofore applicable to the currently effective MTS rates that were suspended and set for hearing herein in our Order of January 21, 1971, 25 F.C.C.2d 151 and to such findings as we may make in Phase II hereof and Docket 18128.

2. As he states:

 While the majority appears to accept the logic of such an adjustment [downward due to the earnings of Western Electric], it defers any appropriate action until conclusion of Phase II. Since the actual return received by AT&T from its investment in Western Electric is identifiable and should be considered in assessing the telephone company's overall rate of return on interstate and foreign operations, I would adjust the allow-

rate of return on its interstate and foreign communications services to compensate for AT&T's earnings from Western Electric," that "Bell does not deny the validity of the Trial Staff's position" but contends that these issues are "clearly Phase II issues . . . ." The Commission then states its position in its finding No. 103, set forth *supra* in Part I.[3]

## III

The court also leaves undisturbed the manner in which AT&T has formulated its tariff to enable it to realize the increased rate of return allowed by the November 22 order. In this connection Microwave Communications, Inc. and MCI Telecommunications Corporation, petitioners in No. 73–2051, challenge the validity of the allocation of the charges among the services of AT&T. Microwave Communications describes itself as "the first of the specialized common carriers who have been authorized by the Commission to compete with AT&T in the provision of interstate private line communications services." Petitioner MCI Telecommunications proposes to provide specialized communications services on a nationwide basis to a number of large cities. Thus AT&T faces competition in providing interstate private line service, in contrast to its monopoly of interstate long distance telephone services. In this factual situation petitioners point out that the Commission has permitted the increase in charges to be borne entirely by the services of which AT&T has a monopoly, thus subsidizing AT&T's special services with which petitioners and others compete. This they contend calls upon the Commission to protect the public against "the dangers of cross-subsidization and the anti-competitive conduct" thus made possible. They point out that as long ago as 1965 the Commission stated that the importance of a determination of the lawfulness of rate levels and rate relationship within AT&T's interstate rate structure,

> is underscored by the fact that certain of the services involved are furnished by the Bell System in direct competition with services offered by other carriers. To the extent that these services may be underpriced by the Bell System, this may have a competitive impact on such other carriers.

*AT&T,* 2 F.C.C.2d 871, 872 (1965).

In 1969, we are also reminded, the Commission stated:

> It was . . . and still remains, our concern that the basic message toll telephone service (m.t.t.), for which there is no directly competitive service, should not be burdened by, or required to subsidize, the so-called competitive services.

*AT&T,* 18 F.C.C.2d 761, 762 (1969).

Again:

> We were concerned that the basic message toll telephone (MTT) classification of service and the closely related wide area telephone service (WATS), for which there are no directly competitive services and for which the earnings level were relatively high, should not be burdened by, or required to subsidize the so-called competitive services for which the earnings level were relatively low.

*AT&T,* 23 F.C.C.2d 503–504 (1970).

Having reached its position respecting the rate of return in the November 22 order the Commission authorized the company to submit a proposed rate schedule, which it did in a manner which required the increased charges to be borne entirely by MTS—interstate message telecommunications service— AT&T's monopoly services. The AT&T services which compete with private line services were thus left free of any in-

---

able return accordingly. (Footnote omitted.) (J.A. 131.)

**3.** The appropriate resolution of the issue arising from the Western Electric earnings of

course does not depend upon whether or not Bell agreed with the position of the Trial Staff.

crease in the charges placed in effect to realize the rate of return allowed by the Commission.

Though the Commission has not prescribed those charges as the result of a section 205 proceeding, they and their allocation among AT&T's services have been promulgated in response to the Commission's request that AT&T implement the manner in which the rate of return would be realized. Both the 8.5%–9% rate of return and the rates charged bear sufficient imprimatur of the Commission, by its action and inaction, to bring the result within our reviewing responsibilities. The court is not disabled from passing upon alleged discriminatory or otherwise unreasonable features residing in the rate of return or the manner in which it is sought to be realized. Since the rates exempt AT&T's competitive services, imposing the total burden of the increase upon its monopoly services, they are prima facie discriminatory and inconsistent with sound public policy.

In the exercise of its equitable powers [4] at least some clarification of the situation should be required by the court which is reviewing the proceedings in which this appears. It is clearly within the power of the court to structure as it does the further proceedings to be had, but I think the court would be well advised to be more insistent with respect to the matter now considered and require the Commission to show cause why the cross-subsidization of AT&T's competitive services should not be terminated, the court's order to that effect to be returnable within a reasonable period to be fixed by the court.

**4.** *Mobil Oil Corp. v. FPC,* 417 U.S. 283, 311, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974).